[No. 31444.   Department One.   February 13, 1951.]

THE STATE OF WASHINGTON, *Respondent*, v. WAYNE ODELL, *Appellant*.[1]

[1]Reported in 227 P. (2d) 710.

*Del Cary Smith* and *Robertson & Smith* (*Claude K. Irwin,* of counsel), for appellant.

*Lawrence Hickman, S. R. Clegg,* and *Edward G. Cross,* for respondent.

BEALS, J.—The defendant, Wayne Odell, was born in Whitman county October 8, 1927, and, with his parents, resided at Steptoe, in that county.

Very early on the morning of December 24, 1949, the defendant killed Harold Rogers, by shooting him with a shotgun, at the latter's home near Winona in Whitman county. Thereafter, he was, by information, charged with the crime of murder in the first degree, and pleaded not guilty, entering a special plea of insanity or mental irresponsibility, including in the plea a statement that the "mental irresponsibility still exists." His trial before a jury resulted in a verdict of guilty as charged, and the jury also returned a special verdict finding that the death penalty should be imposed.

From a formal judgment of guilty, imposing the death penalty, the defendant has appealed, making the following assignment of errors:

"(1) The court erred in admitting in evidence plaintiff's Exhibit U, being the detailed confession of an offense committed five years previously.

"(2) The court erred in giving Instruction No. 23-½ which is as follows:

" 'Irresistible impulse is not insanity and is no defense. An irresistible impulse is an impulse induced by, and growing out of, some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequences of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it. It is to be distinguished from mere passion or overwhelming emotion not growing out of, and connected with a disease of the mind. Frenzy arising solely from the passion of anger and jealousy, regardless of how furious, is not insanity.'

"(3) The court erred in permitting the witnesses Harold Scott, Cora Jean Rogers and Emily Rogers to testify on

rebuttal that in their, opinion the defendant was sane and understood the difference between right and wrong.

"(4) The court erred in refusing to grant defendant's motion for mistrial after the admission in evidence and the reading to the jury of plaintiff's Exhibit U.

"(5) The court erred in denying defendant's motion for a new trial.

"(6) The information does not state facts sufficient to constitute a crime."

During his seventeenth year, appellant was charged with the crime of forcible rape and, upon his plea of guilty, was sentenced to and served a year in the state reformatory at Monroe. Upon his release, he returned to his home at Steptoe, but, soon thereafter, made his home with an uncle living at Winona, where he completed the last two years of a high school course.

During this period, appellant became acquainted with Cora Jean Rogers, who was about a year younger than appellant. Apparently, the young lady for a while discouraged appellant's attentions, but later they became interested in each other. This association, broken by occasional quarrels, continued until about a week before Christmas, 1949, when Miss Rogers told appellant that she did not wish to see him any more.

On the evening of December 23, 1949, appellant, with his friend Kenneth Broyles, attended a dance in the town of Washtucna, in Adams county. They drove to the dance in appellant's car and, while en route, drank some whisky from a bottle that was in the car. Not long after their arrival at the dance, Miss Rogers arrived, accompanied by Harold Scott. On seeing the young lady, appellant became somewhat disturbed and immediately insisted upon dancing with her, monopolizing her company during most of the evening, in the course of which a somewhat violent quarrel occurred between appellant and Miss Rogers' escort, Scott. Appellant threatened to kill Miss Rogers, stating that he would ruin her before the end of the week. He also attempted to force a fight with Scott (from which he was restrained by his associate Broyles), and threatened to kill

Scott. In an attempt to quiet appellant, Scott then took him and Broyles to Scott's car, where, during a period of about three quarters of an hour, some liquor was consumed. During this time, appellant made the statement that he would "just as soon" kill Scott, and "take what he got for it."

On leaving the dance at about one o'clock a. m., Scott remarked to appellant that they should be on friendly terms, to which appellant apparently assented. Scott then took Miss Rogers to her home near Winona and departed.

Appellant and Broyles left Washtucna in appellant's car, with Broyles driving. It appears that there was not much conversation between the men during the journey, and, upon their arrival at Broyles' home near Steptoe, he asked appellant to pass the night there. Appellant declined the invitation, saying that he preferred to return to his home.

The Rogers home near Winona consisted, in part, of two bedrooms, one occupied by the daughter and the other by her parents, the rooms being connected by a hallway approximately eight feet long. There was also a living room and a kitchen. The doors to the house were locked and all the windows screened.

Upon her arrival at home, Miss Rogers retired and went to sleep. At about 4:30 a. m., she was awakened and saw appellant standing by her bed, holding a shotgun which was pointed directly at her. She screamed and pulled the bedclothes over her head. Her scream awakened her father, who arose and came to the door of his bedroom, accompanied by Mrs. Rogers. Several lights in the house were turned on, and appellant was then standing in the living room doorway. Appellant warned Mr. Rogers not to move or he would shoot. Mr. Rogers told him to put the gun down, whereupon appellant made a remark to the effect that he had lost his girl. Mr. Rogers then started toward appellant, who backed into the living room, Mr. Rogers following him. While the two were in the living room and not visible to Mrs. Rogers or her daughter, a shot was fired. Miss Rogers ran into the living room, and saw her father staggering and appellant throwing the shotgun to one side as he departed

through the kitchen. Mr. Rogers was mortally wounded and died within a very short time.

Miss Rogers took the family automobile and went for assistance. Mrs. Rogers saw appellant running down the road in the same direction that Miss Rogers had driven the car. Appellant's automobile was found about a mile away from the Rogers home, and he was apprehended in the course of the morning of December 26th, when he was found hiding under the stage of the auditorium at the Winona high school. When discovered, appellant attempted to escape, was fired upon and wounded, and was soon found in a house nearby.

Appellant's trial lasted from March 13th to 21st, inclusive, 1950. He did not take the witness stand. By the evidence introduced on appellant's behalf, it was sought to prove that, at the time of the killing, appellant was insane or temporarily mentally irresponsible. Considerable latitude was allowed in the introduction of this testimony. Dr. Robert Wetzler testified on appellant's behalf as an expert in mental diseases. Dr. William Freeman, appellant's physician, also testified as a witness for him.

Dr. Wetzler testified that he had interviewed appellant at length, and also his parents. The witness testified that appellant had told him that, in 1945, when he was seventeen years of age, he was sentenced to the reformatory for rape, appellant stating that "he didn't think it was as bad as they said it was." The witness said that, from statements made to him, it appeared that, in his very early youth, appellant was nervous and unable to mix with other children; that it was hard for appellant to adjust himself in school and that he had difficulty in learning; that the years of his adolescence were somewhat abnormal and that he received no "sex instruction"; that confinement in the reformatory for a year was, "of course, quite traumatic to his personality"; that appellant felt he was not treated well in the reformatory; that, when he returned home, he felt like an "outcast"; that he was bitter and resentful, and had difficulty in adjusting his life, feeling that people treated him as a convict;

that he indulged to some extent in intoxicating liquor, and that, when Miss Rogers refused to have anything more to do with him, "he became lost; he no longer had a source of release for his intense desire of being with the female sex, and of course this was the last blow to his crumbling personality."

Referring to the time of the murder, the witness testified: "I would classify Wayne Odell at this time, and, in fact, all his life, as a psychopathic personality and schizoid personality."

By a long hypothetical question, in which appellant's counsel attempted to embrace all of the relevant facts which were in evidence, including the fact that appellant had served a year in the reformatory, counsel asked the witness whether or not, at the time of the homicide, appellant was able to distinguish between right and wrong. To this question, the witness answered: "He was incapable of determining what was right or wrong at that time," later giving the reasons for his answer at considerable length.

Dr. William Freeman, a physician engaged in general practice in Colfax, testified that he had been appellant's personal physician since the summer of 1946. In open court, appellant consented that the witness might testify concerning any confidential matters he had learned from appellant by acting as his physician. The witness testified that appellant had consulted him on several occasions, being of the opinion that he suffered from heart trouble; that the witness could never find anything wrong with appellant's heart, save that he had a high pulse rate; that appellant was mentally disturbed concerning "his love affairs"; that he wished to marry Miss Rogers, who would not accept him as her fiance, and that, after appellant was arrested and in jail, the witness treated him for a gunshot wound in his right arm.

In response to a long hypothetical question concerning appellant and the events just preceding the murder, the witness (over respondent's objection based upon his lack of qualifications as an expert) stated: "In my opinion Wayne

Odell, at the time he pulled the trigger on the gun could not distinguish between right and wrong."

On cross-examination, the witness testified that, on all of the occasions when he had seen appellant, it was his opinion that appellant knew the difference between right and wrong, and the witness did not assert that appellant was insane. Prior to the homicide, the witness had last seen appellant during the latter part of October, 1949, and testified at considerable length concerning appellant's peculiar personality.

Assuming certain facts stated by respondent's counsel concerning events which transpired on the evening of the murder, the witness stated that, when appellant approached the Rogers home and when he entered the house, appellant might have known the difference between right and wrong. The witness gave no opinion as to appellant's state of mind up to that time. The following then occurred during the cross-examination of the witness:

"Q. Now, Doctor, as a matter of fact in your opinion it is possible, is it not, that when Wayne Odell pulled the trigger and fired the shot that killed Harold Rogers that he at that time did know the difference between right and wrong? A. I don't think he did at that time. Q. Is it possible he did? A. Not in my opinion. Q. In other words, you are saying it was not possible that at that time he knew the difference between right and wrong? A. I say in my opinion it's not possible. Q. Now, aside from your opinion is it possible that at that time he knew the difference between right and wrong. MR. SMITH: We object to that— THE COURT: Objection sustained. Q. Now, do you think, Doctor, from your knowledge of this defendant that he knew what he was doing when he carried a shotgun for a mile up to the Rogers home? A. I don't know. Q. Do you think he knew the difference between right and wrong when he withdrew from Cora Jean's bedroom immediately after she screamed? A. I don't think he could distinguish right from wrong at that time. Q. Do you think her scream is what caused him to be unable to distinguish the difference between right and wrong? A. Very likely that was the point in my opinion. Q. Prior to that time you are unable to say one way or the other on the question. A. No."

The witness further testified that he had treated appellant for some time after the arrest, and that, in his opinion, appellant then knew the difference between right and wrong.

Appellant's parents both testified on his behalf, stating his childhood characteristics and incidents of his boyhood, with particular reference to his conviction of the crime of rape in 1945. Their testimony, of course, was purely factual and not professional.

J. L. Mulcahy, a member of the Washington state patrol, on duty at Colfax, testified concerning the search for appellant, his arrest, and the wound from which he was suffering.

Appellant's first assignment of error is based upon the ruling of the trial court admitting in evidence respondent's exhibit U, which is a statement signed by appellant May 9, 1945, in the presence of two witnesses, containing appellant's account of the events which resulted in his conviction of rape and sentence to the reformatory. This statement reads in part as follows:

"I, Wayne Dale Odell, born at Colfax, Washington, on the 8th day of October, 1927, presently residing at Steptoe, Wash. and employed by ——————————, do hereby make the following statement to L. M. (Pete) Parnell, whom I know to be a Sheriff attached to the Whitman County Sheriff's Office at Colfax, Washington. I make this statement of my own free will and volition and without duress or promise. I also understand that this statement can be used against me in a court of law.

"Last Saturday night, May the 5th, about eight o'clock, I met ——————————, at her house, in Steptoe. We came to Colfax and went to the show. The show was out around eleven o'clock and we went down to the Shamrock Cafe and had a couple of cokes. We left there and went out in the country about two and a half miles from Steptoe near the Smith Place on the Butte road that leads off the Oakesdale road. This was around midnight. I stopped the car. We sat in the car and necked for a while and then I got the notion that I was going to rape her. I had a 22 rifle in the back seat of the car. I got on my knees on the front seat and faced the back of the car and she asked me what I was doing, and I told her nothing. I asked her if she was going to . . . She said I don't want to. I told her I had a gun

in the back seat and if she didn't . . . I might use it. I picked the gun up and she said yes she would and I gave her the loaded shell out of the gun and she threw it out of the window. . . . After it was over . . . I took her home. As far as I could see she didn't seem to be put out any with me at all.

"I have read the above statement consisting of one page and I attest that it is a true and accurate account of the facts which occurred. Witness my hand this 9th day of May, 1945.

"(Signed) WAYNE DALE ODELL.

"WITNESSES:
"[Signed] L. M. (Pete) Parnell.
"[Signed] M. L. Powers."

Two physicians were called as witnesses by the state, Dr. Edward R. Hodgson, a psychiatrist practicing in Spokane, and Dr. H. R. Lewis, a psychiatrist of several years' experience. These two doctors examined appellant after his arrest and while he was in a hospital in Spokane. The witnesses examined exhibit U; each read the court reporter's transcript of the hypothetical question propounded by appellant's counsel to Dr. Wetzler, and each witness stated that, having that question in mind, he was of the opinion that appellant, December 24, 1949, knew the difference between right and wrong.

Appellant vigorously contends that "the dominant error" in the record is the admission in evidence, during the course of the state's rebuttal, of respondent's exhibit U, *supra,* contending that this document, whereby appellant admitted his guilt of the crime of forcible rape committed five years previously, afforded counsel for the state an opportunity to lay great stress upon that evidence during the examination of the state's medical witnesses in rebuttal, and that the exhibit undoubtedly influenced the jury not only in bringing in their verdict but in fixing the death penalty.

Appellant also stresses the fact that the evidence concerning the association of appellant with Miss Rogers fails even to suggest that there was between them any immoral act.

As above stated, appellant did not take the stand as a witness. Appellant's former conviction was first referred to

by Mr. Broyles in the state's case in chief. Mr. Scott referred to it, while testifying as a witness for the state, in relating a conversation between the witness and appellant during the evening preceding the homicide.

On direct examination, appellant's witness, Dr. Wetzler, testified in part as follows:

"He said in 1945 he was sentenced to the reformatory for rape. He stated he didn't think it was as bad as they said it was. He was seventeen at the time. The girl was 17½. He was in the reformatory for one year. He stated he had a rough time for more reasons than one and it made him feel disgusted with life. He thought people hadn't treated him fair. He had been told to plead guilty and take probation for five or ten years but, instead, he was sentenced to the reformatory. While in the reformatory he was on a farm and did the usual chores. He got along with just a few of the boys because the others were no good. Many of them didn't like him because he got on the trusty detail so quickly. This was managed by friends who eventually got him released. He was never in any serious trouble while there. Upon his return he was quite disgusted. He was not able to return to his home because of the regulations, and had to live with an Uncle in Winona. The first week he was there there was a dance and he wanted to go but his uncle refused permission, and this seemed to make him more and more bitter as he felt they didn't trust him. Everybody was afraid since he had been in trouble he would be again, they expected it of him. During his first year out of the reformatory he felt that everybody was against him, that he had no friends except his immediate family; that the kids didn't like him, that they didn't treat him right, they shunned him. He remembers the first week he tried to talk to a girl and she turned around and ignored him. He spent the time by himself. He wasn't able to mix in society. He felt that people talked about him behind his back. They didn't want to associate with a convict. That he had no dates and no fun. He was able to get along with his cousins and no one else."

This matter was also referred to at some length by Mrs. Odell during the course of her examination in chief.

The prior conviction of appellant, upon his plea of guilty, was referred to by appellant's witnesses, his expert witness, Dr. Wetzler, evidently deeming that matter of importance

in drawing his conclusions as to appellant's mental condition at the time of the commission of the offense with which he was charged in the case at bar.

Appellant concedes that, when the defendant in a criminal prosecution takes the stand on his own behalf, on cross-examination he may be subjected to a limited examination concerning a prior offense for which he had been convicted, especially when the defendant denies or seeks to excuse or explain the prior conviction. *State v. Wilson,* 26 Wn. (2d) 468, 484, 174 P. (2d) 553.

In this connection, appellant cites *State v. Clayton,* 32 Wn. (2d) 571, 202 P. (2d) 922, in which the defendant was charged with attempting to carnally know a female child fifteen years of age. He was found guilty by a jury, and appealed from a judgment of conviction and sentence, assigning error, *inter alia,* upon questions propounded to him during cross-examination concerning occasions when he had been arrested. It was not contended on the trial that the defendant was insane. The case is not here in point.

Appellant strongly relies upon the case of *State v. Goebel,* 36 Wn. (2d) 367, 218 P. (2d) 300, in which the defendant appealed from conviction of the crimes of rape and sodomy committed upon two young women. The defendant interposed no plea of insanity. On rebuttal, the state was allowed to introduce in evidence the defendant's signed confession of attempted rape upon a third young woman, the state contending that the confession impeached the defendant by contradicting his testimony concerning the route he had followed just prior to accosting one of the two women for whose rape he was on trial. The trial court limited the evidence admitted to impeachment. This court held that any impeachment of the defendant's testimony by the admission of the signed confession concerned a purely collateral and immaterial matter, and that the admission of the confession for impeachment purposes constituted reversible error. The opinion suggested that, on a second trial, evidence concerning an attempted assault upon the third young woman might,

under certain circumstances and for certain purposes, be admissible. The case is not here in point.

Appellant also cites *State v. Barton,* 198 Wash. 268, 88 P. (2d) 385, in which the defendant was charged with and convicted of the crime of murder in the first degree. The defendant was charged with the murder of one Adolph Sandell, who had been married to and divorced from defendant's sister Grace, who, notwithstanding the divorce, had continued to live with her former husband. Defendant pleaded not guilty to the charge and entered a special plea of mental irresponsibility. The state called Grace Sandell as a witness during the introduction of evidence in its case in chief. She testified, *inter alia,* that, some months after the death of her husband and before the defendant was arrested for Sandell's murder, defendant had made advances to the witness in an attempt to commit the crime of incest. On the defendant's appeal, error was assigned upon the admission of this testimony, and this court held that the testimony was erroneously admitted as part of the state's case in chief, not falling within the recognized exceptions that evidence of a collateral crime may be properly admitted for the purpose of showing a motive, because, in the case before the court, there was no "causal relation or natural connection between the attempted crime of incest and the crime of murder for which the appellant was being tried."

Appellant argues that, if, in the case at bar, the state's exhibit U was competent evidence for any purpose, this court, in the *Barton* case, *supra,* would have held that the testimony of Barton's sister was also competent. In the case cited, the evidence erroneously admitted was not introduced by the state for the purpose of proving the defendant's sanity, but to show motive for the murder. When the evidence was received, the defendant had not introduced any testimony and, so far as the defendant was concerned, there was nothing before the court save his pleas referred to above. The case is clearly distinguishable from the case at bar.

Appellant cites the case of *State v. Lindsey,* 27 Wn. (2d) 186, 177 P. (2d) 387, 181 P. (2d) 830, in which the defendant appealed to this court from a conviction of murder and assault in the first degree. While the opinion does not directly so state, it is evident that the defendant had interposed a plea of not guilty and also a plea that he was insane at the time of the commission of the offense. The defendant testified on his own behalf, and, on cross-examination, was questioned as to his prior conviction of a crime, by an Indiana court. In appellant's brief, the record in the case and the opinion of this court are, in part, incorrectly quoted as follows:

" 'The Court: *You may ask him what he was convicted of, Mr. Shinn.*

" 'Mr. Greenwood: Yes, Mr. Shinn, *I know that is the usual rule, but I understand that in insanity that this man's life is an open book.*' "

As quoted in the opinion, the statement of facts reads as follows:

" 'THE COURT: *You may ask him what he was convicted of, Mr. Shinn.* MR. GREENWOOD: Yes. MR. SHINN: *I know that is the usual rule, but I understood that in insanity that this man's life is an open book.*' "

On further cross-examination, Lindsey was questioned concerning the crime of which he was convicted before the Indiana court and asked if someone had died as a result of the offense. The defendant was also asked by counsel for the state if, upon his arrival in Seattle, he had registered with the police as an ex-convict. Objection to this question was sustained, and the jury told to disregard it. The defendant was convicted and, on appeal to this court, the judgment was reversed and the cause remanded for a new trial. No question was presented to the trial court concerning the admissibility of the above evidence for the purpose of showing the sanity of the accused. Apparently, counsel for the state had attempted to impeach the credibility of the witness by endeavoring to elicit from him details of a prior crime, contending that such evidence was relevant and competent for impeachment purposes because the defendant

had entered a plea of insanity. This court held the questions inadmissible for the purpose of impeachment, but did not discuss their admissibility on the issue of insanity as this question was not raised. The opinion does not support appellant's contention in the case at bar.

Appellant cites the case of *State v. O'Donnell*, 191 Wash. 511, 71 P. (2d) 571, in which two defendants appealed from a judgment and sentence imposed upon their conviction by a jury of the crime of murder in the first degree. The defendants had pleaded not guilty, but entered no plea of insanity. It appeared that the prosecuting attorney, in his opening statement before the jury, had said that the evidence would show that both of the defendants had criminal records and had " 'served time in penitentiaries.' " On appeal, this court reversed the judgment appealed from, holding that, by the statement made to the jury, the prosecution had placed the defendants' characters in issue before they had taken the stand, thereby placing the defendants "in a position where they had either to take the witness stand or rest under the imputation" of having been previously convicted of the crimes stated by the prosecuting attorney. The case cited does not support appellant's argument.

Appellant also relies on the case of *State v. Folsom*, 28 Wn. (2d) 421, 183 P. (2d) 510, in which the conviction of the defendant for the crime of manslaughter, by abortion, was reversed and the cause remanded for a new trial, because of error on the part of the trial court in instructing the jury and because of the admission of evidence, over defendant's objection, concerning abortions committed by defendant several months after the alleged commission of the crime of which defendant was found guilty. There was no plea of insanity. The case is not in point.

Appellant further relies upon the case of *People v. David*, 12 Cal. (2d) 639, 86 P. (2d) 811, in support of his contention that, even though the trial court did not err in admitting evidence concerning the prior conviction of defendant, it erred in admitting detailed evidence concerning the facts in the earlier case. In the case cited, David was charged

with the crime of murder and with violation of the California concealed weapons act. Upon arraignment he pleaded not guilty by reason of insanity. The jury found that the defendant was sane and, after hearing additional evidence, the court entered judgment determining the degree of the crime to be that of murder in the first degree, without mitigating or extenuating circumstances, and imposing the death penalty. The supreme court, sitting *En Banc,* affirmed the judgment. The defendant, *inter alia,* contended that reversible error had been committed by the court's rulings in connection with questions propounded by the district attorney to certain witnesses, by the admission of certain testimony, and by counsel for the prosecution in argument to the jury. It was not contended that the evidence was insufficient to support the jury's finding of sanity.

It appears that, before the defendant David was called as a witness on his own behalf, his mother had testified concerning various portions of his life, but omitted two periods thereof. On cross-examination, counsel for the state asked the witness where the defendant was when he was seventeen years of age, one of the periods concerning which his mother had not testified. An objection to this question was sustained and the jury instructed to disregard a remark of counsel for the state to the effect that the defendant was, at that time, in the penitentiary. The supreme court held that the trial court properly sustained the objection to the questions, and that the error in the prosecutor's statement had been cured by admonition from the court, the opinion continuing:

". . . Furthermore, the defendant was being tried solely upon the question of his sanity at the time the offense with which he was charged was committed, and a reference to those matters was less calculated to bias the jury than if his guilt or innocence had been in issue. Moreover, at a later time when the defendant was a witness in his own behalf, he was properly asked about the prior convictions."

It appears that, when the defendant took the stand as a witness on his own behalf, the state was not allowed to cross-examine him concerning previous convictions, save as

to the fact that he had been previously convicted and the nature of the crimes with which he had been charged. The supreme court held that such cross-examination was proper for the purpose of impeaching the credibility of the witness. Later in the opinion, the court considered other evidence introduced by the state concerning details of another crime which the defendant had committed ten days prior to the commission of the crime for which he was being tried. The court held that this evidence had been properly admitted, saying:

"Evidence which tends to prove a sane motive for the crime and an ability on the part of the accused to devise and execute a deliberate plan is material to the issue raised by a plea of not guilty by reason of insanity. [Citing cases.] Furthermore, it is the rule that where a defense of insanity is interposed and evidence of the previous conduct of the defendant is offered by him, the prosecution is not limited to an explanation or denial of the particular conduct of the defendant, but may offer evidence of other acts which he committed within a reasonable time before or after the crime as tending to show that he was sane at the time of the offense for which he is then being tried. [Citing cases.] The period of time over which an inquiry of this character should be extended is a matter which rests largely within the discretion of the trial court. [Citing cases.]"

In the case at bar, the evidence was not offered for purposes of impeachment, but as material evidence on the issue of insanity.

In his opening and reply briefs, appellant cites other decisions in connection with this phase of counsel's argument. We have examined these authorities but find none which require further discussion in connection with the peculiar facts of the case at bar, in which the record discloses that appellant's prior conviction was discussed at some length by his own witnesses, appellant not having taken the stand as a witness on his own behalf.

■ The general rule is stated in standard texts as follows:

"Considerable latitude is allowed by the courts in admitting evidence which has a tendency to throw light on the

mental condition of the defendant at the time of the commission of the crime, provided the proof tends to prove or disprove the issue involved. Every act of the defendant's life relevant to the issue is admissible in evidence when the defense of insanity, general or partial, is set up." 20 Am. Jur. 324, § 349.

"The first and fundamental rule, then, will be that *any and all conduct* of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity." 2 Wigmore on Evidence (3d ed.) 9, § 228.

"One of the affirmative defenses frequently advanced in criminal cases is insanity, and evidence which properly tends to show that the accused is of sound mind will not be rejected because it also tends to prove another offense." 1 Wharton's Criminal Evidence (11th ed.) 555, § 358.

In the recent case of *State v. Williams,* 34 Wn. (2d) 367, 209 P. (2d) 331, the defendant was charged with the crime of murder in the first degree. The defendant pleaded that he was insane or mentally irresponsible at the time of the commission of the crime with which he was charged and, by an amended plea, further stated that his insanity and mental irresponsibility still existed. On the trial, the defendant's mother, a witness on his behalf, was allowed to testify concerning the defendant's acts and habits from his infancy to the time of the trial. The defendant did not take the stand. In the course of the opinion, appears the following:

"Many authorities are cited by appellant to the effect that testimony concerning statements made by a defendant may be competent evidence upon an issue of sanity or insanity. That rule of evidence is well recognized;  . . ."

We also quoted from 1 Wharton's Criminal Evidence (11th ed.) 428, § 318, as follows:

" 'When mental irresponsibility is interposed as a defense for a criminal act, great latitude is allowed in proving the mental condition of the accused. Both the state and the defendant may go to great length in offering evidence as to acts, conditions, and conduct of the accused, not only at the time of the offense, but prior and subsequent thereto.' "

The supreme court of Mississippi, in the case of *Smith v. State*, 95 Miss. 786, 49 So. 945, affirmed a judgment of guilty of the crime of murder, entered by the trial court pursuant to the verdict of a jury. The defense was "delusional insanity," one of the defendant's assignments of error being that the verdict was not warranted by the evidence. In the course of the opinion, the court said:

"Where the defense is insanity, general or partial, the door is thrown wide open for the admission of evidence; every act of the party's life is relevant to the issue and admissible in evidence. [Citing cases and authorities.]"

The cases of *Baker v. State*, 190 Ind. 385, 129 N. E. 468, *State v. Carroll*, 52 Wyo. 29, 69 P. (2d) 542, *United States v. Holmes*, 1 Cliff. 98, 26 Fed. Cas. 349, *Winford v. State*, 16 Ala. App. 143, 75 So. 819, and *Anderson v. State*, 209 Ala. 36, 95 So. 171, are to the same effect.

It is true, as stated by appellant, that the first reference to his sentence to the reformatory occurred during the course of the testimony introduced by the state. It does not appear that the evidence disclosed anything concerning the offense for which appellant was sentenced. In the case at bar appellant pleaded not guilty, also entering a special plea of insanity. The evidence introduced by appellant contains several references to his prior conviction and his mental reaction thereto, namely, that he had been unfairly treated. Upon this state of facts, the state had the right, on rebuttal, to introduce evidence concerning the prior conviction, of which exhibit U was a proper part.

Apparently, appellant's counsel contends that the confession has no bearing upon the matter of the use of a gun by appellant. On the contrary, the confession discloses that appellant told his victim that he had a loaded gun, and when she ceased to resist, he unloaded the gun and gave her the bullet.

Appellant's expert witnesses testified that his temporary insanity came on a short period before the murder for which he was tried in the case at bar. In view of the evidence introduced by appellant, it was proper for the state to show,

on rebuttal, that appellant, during the commission of the previous crime, threatened his victim with the use of a loaded gun, which he actually had in his possession.

Appellant's first assignment of error is without merit.

Appellant next assigns error upon the court's instruction No. 23-½, which reads as follows:

"Irresistible impulse is not insanity and is no defense. An irresistible impulse is an impulse induced by, and growing out of, some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequences of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it. It is to be distinguished from mere passion or overwhelming emotion not growing out of, and connected with a disease of the mind. Frenzy arising solely from the passion of anger and jealousy, regardless of how furious, is not insanity."

Appellant excepted to this instruction, arguing that, by other instructions, the jury had been fully advised concerning the matter of insanity and mental irresponsibility as urged as a defense in the case at bar. Appellant contends that the instruction above quoted, even though technically correct as an abstract statement of the law, injected into the case misleading and confusing matters "well calculated to destroy utterly" appellant's defense of insanity. Appellant also argues that, by the instruction, the court informed the jury that, before it could bring in a verdict of acquittal, it must find that appellant was insane and suffering from a mental disease, as distinguished from being mentally irresponsible at the time of the murder.

The general rule has been well stated as follows:

"An instruction which correctly states the law and is based on competent evidence in the case is not erroneous even though it is not in consonance with the theories of either party." 23 C. J. S. 912, § 1312.

"It is not, of course, improper for the court to instruct the jury that certain matters do not constitute a defense, when such is the case; . . ." 23 C. J. S. 752, § 1199.

Appellant's expert witness, Dr. Wetzler, in the course of his testimony, stated that appellant was a psychopath who could not control his sexual desires or his episodic behavior, and that he had outbreaks of unmotivated behavior and impulsiveness. On cross-examination, the witness stated that, when appellant went to the Rogers' home on the evening of the murder, "he was acting under insane jealousy," and did not know what he was doing. The witness denied that this was "irresistible impulse," stating that it was "a driving rage of jealousy."

It is difficult to distinguish between the two mental conditions last referred to by the witness.

When appellant's counsel cross-examined the state's expert witness, Dr. Hodgson, he questioned the witness concerning "compulsive thoughts and acts," things that appellant could not restrain himself from doing. One of his questions was based upon the supposition that an obsessive thought had seized appellant to see Miss Rogers.

In the case of *State v. Maish*, 29 Wn. (2d) 52, 185 P. (2d) 486, 173 A. L. R. 382, this court held that, in this jurisdiction, the defense of irresistible impulse is not available to one charged with crime.

Appellant relies upon the case of *State v. Saffron*, 143 Wash. 34, 254 Pac. 463, in which this court found an instruction given by the trial court to have been erroneous, and remanded the case for a new trial. The defendant had pleaded not guilty, with an additional plea of insanity and mental irresponsibility. By the instruction referred to, the court endeavored to enlighten the jury as to the defendant's plea of mental irresponsibility. After discussion of the evidence, it was held that the instruction was misleading and confusing, and that "it contradicts itself."

In the case of *State v. Schneider*, 158 Wash. 504, 291 Pac. 1093, 72 A. L. R. 571, this court, sitting *En Banc*, held that,

". . . in using the terms 'insanity,' and 'mental irresponsibility,' the legislature intended the same thing, that is, a mental condition because of which the accused was incapable of committing a crime because insane or mentally irresponsible. The trial court did not err in the construction

placed by it upon appellant's plea, and in refusing to recognize any distinction between insanity and mental irresponsibility."

The instruction which, in the case of *State v. Saffron, supra,* this court held to have been erroneous and confusing, was clearly objectionable. The case is not here in point.

In the case at bar, the court's instruction No. 23-½ is not subject to the criticisms leveled against it by appellant's counsel, and it cannot be held that the instruction was anywise prejudicial to appellant. The trial court instructed the jury concerning the phrase "insanity or mental irresponsibility," and appellant preserved no exception to any of these instructions, nor did appellant preserve any exception to the refusal of the trial court to give any instruction requested by appellant.

Appellant's second assignment of error is without merit.

Appellant's assignment of error No. 3 reads as follows:

"The court erred in permitting the witnesses Harold Scott, Cora Jean Rogers and Emily Rogers to testify on rebuttal that in their opinion the defendant was sane and understood the difference between right and wrong."

During the state's case in rebuttal, the witness Harold Scott was recalled. Counsel for the prosecution, over appellant's objection, asked the witness a lengthy question concerning his observation of appellant during the dance at Washtucna, to a great extent repeating the witness' testimony in chief. The question concluded as follows:

". . . Now from all of those observations, and anything else you observed of Wayne Odell that night which I haven't mentioned, but what you have testified to in your direct examination, did you observe anything from his speech, his appearance, his manner of talking, his actions or any other matter of observation that would indicate to you if at any time at the Washtucna dance Wayne Odell didn't know the difference between right and wrong?"

When the objection by appellant's counsel was overruled, the witness answered: "No, I did not." Counsel for the state then asked the witness: "And to the contrary, did you observe anything that evening that particularly indi-

cated to you he did at that time know the difference between right and wrong?" The witness answered: "I think when he threatened to kill me and take the consequences for it that would indicate he knew the difference between right and wrong." Appellant's counsel moved to strike the answer, on the ground that it called for a conclusion of the witness, whereupon the following occurred:

"THE COURT: The witness can testify the manner that the defendant appeared to him, but his impressions about his sanity is beyond the scope. MR. HICKMAN: I withdraw the question. MR. SMITH: I move the jury be instructed to disregard the question and answer. THE COURT: I will sustain your motion and the jury is now instructed to disregard the last question, and the answer made by the witness on the stand."

The witness was allowed to answer a further question, "Did you observe whether or not during the evening at that dance that Wayne Odell was angry?" His answer was "Yes, I did." Counsel's objection to further questions was sustained and the witness was excused, after appellant's counsel had waived cross-examination.

Cora Jean Rogers was then called by the state and testified that, from her observation of appellant on the evening of December 23rd and the early morning of the following day, as previously disclosed by the testimony of the witness, she observed nothing which indicated to her that appellant then did not know the difference between right and wrong. Asked whether or not, during the period that appellant was in the Rogers' home on the early morning of December 24th, she observed anything in connection with appellant's appearance, actions, speech, or anything she saw at that time, which indicated that appellant did not know the difference between right and wrong, the witness answered: "He knew the difference in our home that morning between right and wrong." The witness was then excused.

Mrs. Emily Rogers, Miss Rogers' mother, was then recalled, her attention directed to the testimony she had previously given concerning her observation of appellant in the Rogers' home during the early morning of December

24th, and she was then asked if, from her observation of appellant on that occasion, she noticed anything which would indicate that appellant did not know the difference between right and wrong. Over appellant's objection, the witness was permitted to answer, saying: "He knew right from wrong." The witness was then excused.

Appellant argues that the trial court erred in permitting the prosecuting attorney to ask the witness Scott, over appellant's objection, a long question reiterating the witness' testimony in chief. Appellant's assignment of error does not refer to this question, but, in any event, the matter was one resting largely within the discretion of the trial court. In examining Miss Rogers and Mrs. Rogers, counsel for the prosecution did not repeat the testimony the witnesses had previously given.

Whatever the rule may be in some other jurisdictions, it is the rule in this state that a nonexpert witness may, in answer to a proper question, give an opinion concerning the sanity, at some stated time, of one on trial for a criminal act.

In *State v. Brooks,* 4 Wash. 328, 30 Pac. 147, the court said:

"While, according to the weight of authority, the opinion of a non-expert witness as to the sanity of the defendant may be given, yet such an opinion can only be given after the witness has testified to acts and sayings of the defendant, and as to his conduct which led him to think that the prisoner was insane. These matters must be within the knowledge of the witness, as he could not give his opinion upon facts which were not within his own observation; in other words, he must state the facts and the reasons within his own knowledge which led him to form his opinion as to the sanity of the defendant."

The following cases are also in point: *State v. Constantine,* 48 Wash. 218, 93 Pac. 317; *State v. Craig,* 52 Wash. 66, 100 Pac. 167; *State v. Wilkins,* 156 Wash. 456, 287 Pac. 23; *State v. Schneider,* 158 Wash. 504, 291 Pac. 1093; *State v. Miller,* 177 Wash. 442, 32 P. (2d) 535.

We find no merit in appellant's third assignment of error.

Appellant's fourth assignment of error has been considered, *supra*.

The record discloses no error in connection with the trial court's denial of appellant's motion for a new trial.

Pursuant to his assignment of error No. 6, appellant argues that the information, upon which appellant was tried, is defective in that it fails to allege the date of the death of Harold Rogers. The pertinent portion of the information reads as follows:

" . . . That the said Wayne Odell on or about the 24th day of December, A. D., 1949, in the County of Whitman, State of Washington, then and there being, did then and there wilfully, unlawfully and feloniously, and with a premeditated design to effect the death of Harold Rogers and Cora Jean Rogers, and while engaged in the commission of and attempt to commit the crime of burglary, shoot, kill and murder the said Harold Rogers with a loaded shotgun, . . ."

Appellant argues that, in an indictment or information charging the crime of first degree murder, it must appear that the victim died within a year and a day after the infliction of the injury, otherwise the pleading is fatally defective. It is, of course, true that there is no presumption in favor of a pleading charging a crime and that such a pleading must be definite and certain.

In support of his contention that the information is defective, appellant cites *State v. Spadoni,* 137 Wash. 684, 243 Pac. 854. In the case cited, Gino Spadoni was charged with the crime of first degree murder in the following language:

" 'That the said Gino Spadoni in the county of Pierce, in the State of Washington, on or about the 11th day of March Nineteen hundred and 21, then and there being, unlawfully and feloniously and with a premeditated design to effect the death of Harry Hallen, a human being, did shoot a pistol loaded with powder and ball at and into the body of the said Harry Hallen, and thereby mortally wounding the said Harry Hallen, from which mortal wounds the said Harry Hallen did die; and that such killing of the said Harry Hallen as herein alleged was neither excusable nor justifiable.' "

This court held that the information was defective in not alleging that the victim died within the common-law period of a year and a day after the infliction of the wounds, the information simply charging that the victim suffered mortal wounds from which he "did die." In the course of the opinion, the court said:

"The time of the death being an essential element of the crime, it is the general rule that the time must be alleged in the indictment or information. In the American jurisdictions, at least, no particular form of allegation is required. It is sufficient to state facts showing that the death was instantaneous."

In *State v. Phillips,* 59 Wash. 252, 109 Pac. 1047, this court, speaking through Chief Justice Rudkin, said:

"The defendant was convicted of the crime of murder in the second degree, and prosecutes this appeal from the final judgment and sentence of the court. A demurrer interposed to the information was overruled, and upon this ruling, the first error is assigned. The information, following a form often approved by this court, charged, 'That he, the said Charles Phillips, in the county of Okanogan, in the state of Washington, on or about the 25th day of July, 1908, purposely and of his deliberate and premeditated malice killed one Rawl Siebert, etc.' The specific objection urged against the information is its failure to charge that Rawl Siebert died within a year and a day from the infliction of the mortal wound. There is no merit in this contention. As said by this court in *State v. Day,* 4 Wash. 104, 29 Pac. 984, 'The allegation that the defendant killed the deceased is certainly in effect an averment that the latter died.' See, also, *State v. Cronin,* 20 Wash. 512, 56 Pac. 26; *State v. Yandell,* 34 Wash. 409, 75 Pac. 988; *People v. Sanford,* 43 Cal. 29; *State v. Sly,* 11 Idaho 110, 80 Pac. 1125."

In the case of *State v. Stone,* 169 Wash. 233, 13 P. (2d) 427, this court held that an information charging the defendant with first degree murder, in that he

" ' . . . did then and there wilfully, wrongfully, maliciously and feloniously shoot, wound and kill the said George John with a revolver . . . and did then and there shoot and discharge the said revolver at, against and into the body of said George John and did thereby mortally wound and kill the said George John . . . ,' "

was sufficient, and that the trial court had not erred in overruling the defendant's demurrer to the information. The court considered the case of *State v. Spadoni, supra,* holding that it was not controlling.

In *State v. Hartley,* 25 Wn. (2d) 211, 170 P. (2d) 333, this court, in an opinion by Steinert, J., held sufficient an information charging first degree murder in the following language:

" 'He, the said EARL VICTOR BRUCE HARTLEY, in the County of King, State of Washington, on or about the 11th day of August, 1945, with premeditated design to effect the death of Ida Hartley, a human being, wilfully, unlawfully and feloniously did then and there cut, slash, and wound the said Ida Hartley, with a knife then and there held by him, the said EARL VICTOR BRUCE HARTLEY, thereby mortally wounding the said Ida Hartley, from which said wounds the said Ida Hartley then and there died.' "

The defendant appealed from a judgment of guilty as charged, entered upon the verdict of a jury, assigning as error, *inter alia,* the overruling of his demurrer to the information, the defendant contending that the information was defective in that it failed to allege that the victim died within a year and a day of the time of the infliction of the wounds. In considering this matter, the court said:

"This language clearly and plainly expressed the charge that on August 11, 1945, in King county, Washington, appellent inflicted upon Ida Hartley wounds from which she died on that day in that county. There can be no possible misunderstanding of the intent and meaning of the language used, namely, that the infliction of the wounds and the death of the victim all occurred on August 11, 1945, in King county."

The court distinguished the case of *State v. Spadoni, supra,* stating:

"The facts in that case were unusual, as pointed out and distinguished in the case of *State v. Stone,* 169 Wash. 233, 13 P. (2d) 427."

The information upon which appellant was tried clearly charges appellant with having killed and murdered Harold Rogers on or about the 24th day of December, 1949.

The words " 'kill and murder' " are too plain to require explanation.

The information in the case at bar was filed January 20, 1950. Appellant entered his plea February 10, 1950; the trial opened March 13, 1950, and closed March 21st following. The judgment was filed May 1, 1950. The notice of appeal was served and filed May 1, 1950, and the case was argued before this court October 9, 1950, all within one year following the commission of the offense for which appellant was tried.

The trial court did not err in overruling appellant's demurrer to the information.

The record before us is free from error, and the judgment appealed from is affirmed.

SCHWELLENBACH, C. J., HILL, HAMLEY, and DONWORTH, JJ., concur.

---

March 28, 1951. Petition for rehearing denied.