[No. 1209-2.    Division Two.    November 18, 1974.]

THE STATE OF WASHINGTON, *Respondent*, v. FRANK WHITE EAGLE, *Appellant*.

*Edward G. Holm* (of *Mooney, Cullen & Holm*), for appellant.

*Patrick Sutherland, Prosecuting Attorney,* and *Richard A. Strophy, Deputy,* for respondent.

ARMSTRONG, J.—This appeal from a conviction for second-degree murder presents several issues. The most viable is a constitutional challenge to a search of Mr. White Eagle's van. We hold that the admission of the fruits of that search was harmless error.

The relevant facts are these. The defendant, Frank White Eagle, the victim, Theresa Ganuelas, and three friends, Jan Wilson, Leon Rattler, and Phillip Daugherty, were staying at a house in the Nisqually Valley. On May 17, 1973, the five were given a ride to a nearby tavern. After several hours at the tavern, during which they were drinking beer and playing pool, White Eagle left to walk home. Shortly thereafter, the other four were driven home by another acquaintance who did not join them in the house. Soon after they went inside, White Eagle entered the house. In the small living room of the house were a couch and two mattresses. The mattresses were positioned against the walls on each side of the doorway to the kitchen. On one mattress, Rattler and Ms. Wilson sat with their backs against the kitchen wall. Daugherty and Ms. Ganuelas sat on the other mattress with their backs against a couch which was at the end of the mattress. Therefore, the couples faced each other. While they sat talking and drinking beer, White Eagle walked around the room and sat on the couch.

Within an hour of entering the house, Daugherty stood up and walked into the kitchen to get another beer. White Eagle went over and knelt down by Ms. Ganuelas. Ms. Wilson, Rattler and Daugherty each testified that at this point they heard a noise, and when White Eagle stood up they saw a knife with some blood on it in his hand. They also saw Ms. Ganuelas try to get up and saw some blood on her blouse and on the mattress. Help was summoned, but efforts to revive the victim were fruitless. She subsequently died, the cause of death determined to be a stab wound in the chest.

During the immediate police investigation of the scene, an officer saw White Eagle go over to his van and stand there 15 to 20 seconds. He could not see what White Eagle was doing. When the officer was at the scene the next day, he remembered seeing this, approached the van, opened the door and seized a blanket which, upon unfolding, he could see had stains which looked like blood on it. Also during the immediate investigation, an officer had asked to see White Eagle's knife, which he willingly handed over. It was later determined that both the blanket and knife had blood on them which could have been the blood of either Ms. Ganuelas or White Eagle.

Subsequently, White Eagle was arrested and the other three held as witnesses. After the witnesses' depositions were taken, during which defense counsel had the opportunity to and did cross-examine, they were given round-trip tickets to Oklahoma, where they lived, and instructed to return for trial. Phillip Daugherty did not return and could not be found. His deposition was published and read at trial.

Dealing first with the reasonableness of the search of the van, we conclude that there were no exceptions which justified a warrantless search. It was not a search incident to arrest because it was not limited to a search of the area immediately within the defendant's control at the time of the arrest. *United States v. Robinson*, 414 U.S. 218,

38 L. Ed. 2d 427, 94 S. Ct. 467 (1973); *Chimel v. California,* 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969). Nor were there exigent circumstances which compelled an immediate search. Though we recognize that the movability of a car may sometimes be an exigent circumstance in and of itself, we do not believe that there was any reason not to get a search warrant first. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971); *Chambers v. Maroney,* 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970). There was sufficient evidence to obtain a search warrant before discovery of the blood on the blanket. As a matter of fact, after seizing the blanket, the officer did obtain a search warrant and searched the whole van. Therefore it was error to admit into evidence the seized blanket.

■ Not all error, however, is reversible error. Whether the error was prejudicial depends upon whether the " 'minds of the average jury' would not have found the State's case significantly less persuasive . . ." without the evidence procured unconstitutionally. *Schneble v. Florida,* 405 U.S. 427, 31 L. Ed. 2d 340, 345, 92 S. Ct. 1056, (1972); *State v. Odom,* 83 Wn.2d 541, 520 P.2d 152 (1974), *aff'g* 8 Wn. App. 180, 504 P.2d 1186 (1973); *State v. Rogers,* 83 Wn.2d 553, 520 P.2d 159 (1974). We conclude that the jury would not have found it "significantly less persuasive" and that, therefore, it was harmless error.

Aside from the introduction of the blanket, there was strong substantial evidence that White Eagle was guilty. The testimony of the three witnesses who saw the stabbing was very convincing. Even after rigorous cross-examination, their testimony was consistent. They each testified that Ms. Ganuelas was all right after Daugherty got up to go into the kitchen, that White Eagle knelt down beside the victim, that when he got up there was blood on her and she was holding her chest, and that they saw a knife with some blood on it in his hand. The witnesses were within a few feet of White Eagle and, therefore, could see clearly. This testimony, in and of itself, was most persuasive.

In addition, there was much other evidence probative of White Eagle's guilt. His knife was found to have blood on it, and there was no persuasive indication that the blood was his. Also, the testimony clearly established that White Eagle was the only one of the five staying at the house who had a knife with him or her. It was established by an expert that his knife could have caused the wound, and that since force was necessary to make such a deep wound, it was highly improbable that the victim stabbed herself.

Immediately after the incident, White Eagle told several persons, including police officers, that a white man (whom he described differently at different times) had come in, stabbed the victim and then jumped out the window and that White Eagle had thrown his knife at him. Upon further questioning White Eagle would not divulge more, but said he would handle the situation himself. This story was not pursued by the defense at trial. Moreover, two witnesses' testimony disproved this account. A police officer testified that during the immediate investigation he had checked the window, found no indication anyone had exited there and, in fact, found a cobweb stretched between two thorny bushes right outside the window to be undisturbed. Having heard White Eagle's story, one of the neighbors on the scene stood where he said he saw the white man go out the window, but she could not even see the window.

Though the testimony was not completely consistent, some of those who arrived immediately after the stabbing saw blood on White Eagle's shirt. Also, though no motive was clearly established, just before the stabbing White Eagle had been pacing around the living room somewhat excitedly, saying that his ring had powerful medicine in it and "when my brother gets five feet away . . ." This latter phrase very likely referred to Daugherty.

Within an hour of the incident, White Eagle made two inculpating statements. He told Ms. Wilson that Rattler would be next. A little later, he went to a trailer near the

scene where an acquaintance lived and told two persons that there were two informers around and that he had just gotten rid of one. Clearly, even without the blanket, the State established a persuasive case.

We also find that White Eagle's additional assignments of error are not grounds for reversal. First, he was not denied his right to confront witnesses against him by the introduction of Daugherty's deposition at trial. Such a deposition may be introduced if the defense had an opportunity to cross-examine and the witness is now unavailable without connivance of the party introducing the deposition. *Barber v. Page*, 390 U.S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318 (1968); *State v. Ortego*, 22 Wn.2d 552, 157 P.2d 320, 159 A.L.R. 1232 (1945); RCW 10.52.060. Both conditions were met here.

Second, White Eagle was not entitled to an instruction on flight to present his theory of the case that Daugherty did not return for trial because he was the murderer. There was not sufficient evidence to support the giving of such an instruction. Daugherty was not a suspect once White Eagle was arrested. Also, it was not his returning to Oklahoma which is claimed to be flight, but his failure to return to testify at trial. This is a very different claim than a claim that someone fled from the scene or was avoiding arrest, and no attempt was made to show that the fact he could not be found reflected anything more than the fact that he did not desire to testify. An instruction on flight must be based on substantial evidence and not speculation or conjecture—the latter is all we have here. *State v. Bruton*, 66 Wn.2d 111, 401 P.2d 340 (1965); *State v. Nichols*, 5 Wn. App. 657, 491 P.2d 677 (1971).

Third, White Eagle was not entitled to a manslaughter instruction. The only basis on which it was argued that he could not form the requisite intent for murder was that he was intoxicated. The testimony of both White Eagle and the witnesses was that he was not intoxicated, but rather that he was walking normally, talking

clearly and remembered what happened. Where there is no evidence indicating manslaughter, a manslaughter instruction may not be given. *State v. Huff*, 76 Wn.2d 577, 458 P.2d 180 (1969); *State v. Johnson*, 69 Wn.2d 264, 418 P.2d 238 (1966).

Affirmed.

PEARSON, C.J., and PETRIE, J., concur.

Petition for rehearing denied December 31, 1974.

Review denied by Supreme Court February 10, 1975.