[No. 37591. Department Two. September 15, 1966.]

THE STATE OF WASHINGTON, *Respondent,* v. RUSSELL EDWARD JOHNSON, *Appellant.**

*Reported in 418 P.2d 238.

 ██

*Caplinger & Munn* and *James S. Munn,* for appellant (Appointed counsel for appeal).

*Charles O. Carroll* and *David W. Soukup,* for respondent.

DONWORTH, J.—Appellant, Russell Johnson, appeals from the judgment and sentence imposed upon him after his conviction of second-degree murder. Appellant was tried before a jury on a charge of murder in the first degree. The jury returned a verdict of guilty of second-degree murder. Appellant assigned eight formal assignments of error which raise two distinct issues:

(1) Was appellant entitled, in view of the evidence introduced at trial, to have his proposed instruction on the issue of manslaughter given to the jury?

(2) Was any portion of the testimony of the state's witnesses or the testimony elicited from appellant on cross-examination, concerning the question of appellant's character, admissible evidence?

We shall discuss the facts appropriate to a determination of the first issue and the law applicable thereto, after which we shall discuss the facts and law applicable to the second issue.

Appellant took the stand and testified substantially as follows:

Appellant was a self-employed carpenter-contractor, aged 36, married, with four children 7 years old and younger. At the time of the homicide, appellant was living at home with his wife and children. About one year before the homicide, appellant's wife had answered a newspaper advertisement offering personality and I. Q. testing which had appeared in a newspaper apparently placed by the deceased, William Fisk. Mr. Fisk was the minister of the Church of

Scientology, located at 1112½ Fourth Avenue in Seattle. Appellant's wife introduced appellant to Fisk soon thereafter, and the Johnsons became members of the group and participated in its activities. The main theme around which church activity appears to turn is the attempt to bring the members into a "clear" state of mind so that they can cope with their problems.

Some time after appellant had begun to accompany his wife to the Church of Scientology, he had a personal discussion with Fisk concerning his marital difficulties. In this discussion, he received the impression that Fisk, as the minister-teacher of the Church of Scientology, could handle any kind of problem, regardless of what it was.

About two weeks prior to the date of the homicide Fisk telephoned appellant and stated that he wished to see him at the church office. At the interview which followed, Fisk informed appellant that he (Fisk) had had an affair with appellant's wife, both at the church and at appellant's home. Appellant testified that he experienced such a marked physical reaction to this information that he actually fell off his chair. He was profoundly shocked by the candor with which Fisk related his affair with appellant's wife.

Appellant then telephoned his wife, told her what Fisk had said, and asked her to come down to the church office. She arrived about 20 minutes later. Appellant testified that then, in the presence of Fisk, his wife admitted not only her participation in this affair but in other affairs, also, and that she stated that she ". . . enjoyed herself immensely in these affairs that she has had, she wasn't sorry for it, . . . ."

After this occasion, he sought the aid of the Seattle Police Department and was told that he should see the Licensing Department. When he inquired what he could do, the detective to whom he was speaking responded that he could get a divorce. Appellant stated that he did not believe in divorce. He apparently contacted the Licensing Department, but found no help.

He then contacted the FBI, which referred him to the Food and Drug Administration (presumably the United

States Food and Drug Administration). The Food and Drug Administration made an appointment with him during the day time at his jobsite and briefed him on what they had found in Washington, D. C. The agent "appeared to be well acquainted with the case—well acquainted with the Personal Efficiency Foundation." He turned over to the agent of the Food and Drug Administration a number of circulars, pamphlets, small books (apparently obtained by appellant from the Church of Scientology or from Fisk). The agent informed appellant that he could not help him unless the Food and Drug Administration had evidence that the group was using pills or injections of some kind. Appellant knew of no use of pills or injections.

During the period when his wife had been attending meetings at the church, she had become completely detached from him and she telephoned Fisk whenever any problem or emergency arose.

September 7, 1963, appellant purchased the gun with which Fisk was later shot. He purchased it at the request of his wife, who wished him to have a gun to ward off prowlers. The gun was placed under the rug beneath the seat of appellant's automobile, and it remained there until just prior to the time of the shooting.

On the evening of September 10, 1963, after appellant had finished dinner, and was feeling fairly good—"in a good frame of mind," he left his house and got into his car with the intention of going over to a jobsite to discuss the job. When he arrived at the scene of the job, he discovered that he had brought his clipboard but had left his blueprints at home. On his return, when he was nearly home, at about Northeast 95th Street and 40th Avenue, N. E., he decided that he would not be able to return to the jobsite because he would have to spend some time with his children. Since he was in such a good frame of mind, rather than go home, he decided to go down town to the Church of Scientology and see Fisk.

Appellant arrived at the church location, called the Scientology Center, and parked his car nearby. As he arrived, he remembered the affairs his wife had admitted and burst

into tears and pounded on the steering wheel of his car. He does not recall how long he sat in his car or the time of night at this point. Afterward, he left the car and entered the Scientology Center. He carried the gun he had purchased and approached Fisk, apparently in Fisk's office. Appellant states that Fisk had said, "Hi, Russ," and that he had responded, "Hi, Bill," at which point appellant handed Fisk the gun, butt end first. He testified that he saw no one but Fisk and that he is positive that he did not go into the auditing room (the room in which Fisk was shot).

Appellant also testified in connection with this visit with Fisk that he does not recall saying anything to Fisk about the gun as he handed it to him, that the gun was not loaded, and that he intended Fisk no harm. Appellant said that he never intended to fire the gun, and did not fire the gun at any time so far as he can recall.

After he handed the gun to Fisk, appellant was unable to recall anything until he walked downstairs in the church building (the office and the auditing room are on the second floor) and out the door. He entered his car and started the engine, warmed it up for a couple of minutes, as he always does, and drove away.

After appellant had driven for a short period of time, he noticed an odor which reminded him of oil from the motor. He stopped the car, lifted the hood, and found nothing wrong with the car engine. He re-entered the car, and thought that the odor certainly was not coming from the motor. Then he felt the gun in his pocket, and he took it out. The clip was with the gun, and the odor was quite strong. He then testified, "And I thought to myself, 'Oh, my God, what have I done?'" He started the motor up again and proceeded on home, but then stopped and telephoned his lawyer and told him that he thought he had shot a man. The lawyer recommended that they should meet together, after which the lawyer advised appellant as to his rights, and told him to surrender to the police. Appellant followed his counsel's advice.

We now set forth the substance of the testimony of the four persons who witnessed the shooting. They testified

that Fisk entered the auditing room, where these four men were paired off for the purpose of using two machines referred to as emeters. One man in each pair was asking questions of the other and reading the gauges on the emeter to determine the quality of the answer given by the person answering the questions. They were concentrating on this process when Fisk entered and interrupted them. Fisk entered from the doorway which leads to the outer office and walked quickly toward the men and around them, and stated as he walked that there was a man in the building with a gun who was making threats.

At about this time, appellant appeared in the doorway with a gun in one hand and the ammunition clip in the other. Fisk stated that someone should notify the police, that the man was going to kill him. Meanwhile appellant calmly placed the clip in the gun and, holding the gun in one hand, placed his other hand under the hand holding the gun, and leveled the pistol, took deliberate aim and fired. Fisk stepped forward a few steps stating "I have been shot," then fell forward and lay motionless on the floor. Appellant apparently left immediately, but his departure was not noticed by the four witnesses because of the confusion and the attention focused on Fisk. One man went into the next room and tried to telephone the police, but another man who was present completed the call.

Appellant, when arraigned, pleaded not guilty and not guilty by reason of insanity. Appellant called as his expert witness Arthur V. Lamphere, Ph.D., a clinical psychologist, who examined and tested him about two months after the shooting. Dr. Lamphere's testimony covered 20 pages of record. A fair summary of his testimony is contained in the following statements:

Q. Can you, in terms of or in the language of your profession, evaluate the actions just prior to the shooting and during the shooting, just following the shooting here? Can you evaluate Mr. Johnson's actions and reach a conclusion as to his state of mind at that time? A. Well, I feel that for the virtual month prior to the shooting he had been under a great deal of stress, a great deal of pressure. He had—he characteristically is a very passive man, a

man who—to whom it is extremely important to be liked, to gain love and affection, and that his whole world, I think, was in jeopardy during this approximate month before the shooting. That he kind of hoped against hope that things would work out, yet I think almost daily he was confronted with some additional factor which made it hard for him to believe that things were somehow going to work out in his marriage, that he was going to hold his family together. I think he got more and more agitated, more and more preoccupied with this problem. I think the pattern of his life during this month suggests the degree of disturbance that he was going through, that whereas he had been a reasonably hard-working, conscientious person, he was spending a great deal of time away from work; that he had jobs that he should be working on, but that he was neglecting them, he was not getting his work done. That I think these things kept building up in him. That on the day of the killing, he stated he felt much better, and he wasn't sure why. I think he felt better because unconsciously he had decided to resolve the situation. I don't think that he decided this consciously. I think unconsciously this was going on. And then I think he kind of ended up down at Fisk's office without really being aware of why he was going there or what he was going to do. The reasons he gave to himself were rationalizations but not explanations really of what was going on, and I think that he was confused, walking along, acting and behaving, but without any clear awareness of what he was going to do or why he was doing it. I think that at the time of the killing he was in a confused state, and agitated and emotionally disturbed. Q. Now, would you say that at the time of the shooting that Mr. Johnson was temporarily insane?

Mr. Williams: Well, your Honor, I don't think that is the right question.

The Court: Sustained.

Q. (By Mr. Egger) Well, is it possible for a person to—

Mr. Williams: Your Honor, I think that this—well, I will let him finish it.

Mr. Egger: Well,—

The Court: You have the test set forth in one of your requested instructions, in the last paragraph of that particular one.

Q. (By Mr. Egger) At the time of the shooting, Dr.

Lamphere, in your opinion did the defendant know the difference between right and wrong? Was he aware and did he know the difference between right and wrong? A. Taking into account the fact I think he was not aware really of what he was doing, that he was extremely agitated, I think that the knowledge of the difference between right and wrong would have been ineffective in controlling his behavior. I can't say whether he knew, what he knew, right from wrong. This is a question that is extremely hard to answer, because we can't look into the person's mind at this particular moment. We can say that right and wrong would not occur to him; that certainly his behavior, his actions would suggest that it didn't matter to him whether it was right or wrong, that he walked into a room where there were a lot of people, almost as if he didn't care whether what he was doing was right or wrong. Q. Did you find any evidence of psychosis on the day that you examined him? A. No, I did not. Q. Excuse me just a moment. You mentioned earlier that on the day of the shooting he had told you that he felt better than he had for some time. Can you give us any explanation of why he may have felt better? A. Well, as I mentioned before, I feel, my opinion would be that he felt better because he had made up his mind to resolve this situation that he had been in conflict about for nearly a month. I think he had made a decision to do something about it. It is the same thing we see occasionally in people who commit suicide. On the day they commit suicide, they feel better than they have felt for a long time, and the reason seems to be because they have made up their mind to do it, even though consciously they are not aware of it. Q. At the conscious level, then, would it be fair to say that Mr. Johnson was not aware of it? A. That would be my opinion.

The first issue raised by appellant is based on his first three assignments of error. Appellant argues that his proposed manslaughter instruction should have been given because the evidence contained in his own testimony and that of Dr. Lamphere presented an issue of fact as to whether or not appellant had formed an intention, or could have formed an intention or design to effect the death of the deceased. In other words, he claims that this evidence tends to show that he was operating in a dreamlike state, at an

unconscious level, which would preclude the possibility of his having such design, the essential element of second-degree murder as defined by RCW 9.48.040. It is appellant's contention that, if homicide is not one of the two degrees of murder, or excusable or justifiable homicide, then it is manslaughter, under the definition contained in RCW 9.48.060.

■ We disagree. We are of the opinion, after having examined the record with care, that there is no evidence of manslaughter in this case. Appellant either had a defense to the homicide on the ground of temporary insanity or he was guilty of murder in either the first or second degree. The jury could have found him guilty of one or the other of these two crimes, but it could not have found defendant guilty of manslaughter.

This case is like *State v. Moore,* 61 Wn.2d 165, 377 P.2d 456 (1963), wherein the facts showed that the defendant either had a complete defense based on temporary insanity, or was guilty of some degree of murder.

We have read all the cases cited by appellant and find them consistent with *State v. Moore, supra,* and with our holding in the present case. There is an important and clear expression of the interpretation of our homicide statutes stated in *State v. Palmer,* 104 Wash. 396, 176 Pac. 547 (1918), to the effect that in this state our statutory second-degree murder includes the common-law definition of voluntary manslaughter, and our statutory manslaughter includes only the common-law definition of involuntary manslaughter.

We believe that it is clear from the evidence reviewed above that appellant could not have been found guilty of involuntary manslaughter because there was no evidence of this crime. The acts which he committed were not the negligent or unintentional use of excessive force. They were the deliberate and directed acts of an excited or disturbed or provoked person. Unless appellant could persuade the jury that he was not guilty of homicide on the ground of insanity, he could only be found guilty of either first or second-degree murder. The jury apparently did not believe the evidence was sufficient to warrant a finding that appel-

lant was temporarily insane at the time of the killing. The evidence which was submitted in his behalf must have convinced the jury that the state had not sustained the burden of proving him guilty of first-degree murder, and, therefore, the jury found him guilty of second-degree murder. He was sentenced to a maximum term of 20 years in the penitentiary, under RCW 9.48.040 and RCW 9.92.010.

In rendering this sentence, the trial court took into consideration the circumstances preceding and leading up to the homicide and gave appellant every favorable consideration. Appellant has received the full benefit of his testimony and Dr. Lamphere's testimony in so far as it was believed by the jury, consistent with the law of this state.

Appellant assigns as his fourth assignment of error the admission of testimony of Richard B. Jarvis, M.D., a psychiatrist, called as a rebuttal witness for the prosecution. Appellant argues that such testimony must be given in response to hypothetical questions based on evidence introduced at trial, and that Dr. Jarvis was asked no hypothetical questions. Appellant concludes that the testimony of Dr. Jarvis, which was based on only his oral examination of appellant about two days after the homicide was committed, is not properly related to the facts about which he was asked to give his opinion concerning the mental state of appellant at the time of the homicide.

Respondent calls to the attention of the court the fact that this testimony was offered without any objection on the part of trial counsel for appellant, and without any motion to strike or even a request that the answers given be based on a hypothetical question. The admissibility of this testimony was not challenged at trial.

We shall not consider questions not properly submitted to the trial court, for that court must be given a chance to view and correct the claimed error before the matter can be reviewed by us. See *State v. Miller*, 66 Wn.2d 535, 403 P.2d 884 (1965), and cases cited therein.

Appellant also assigns as his seventh and eighth assignments of error the admissibility of the statements made by

witnesses Slipper and Steincipher (who were called as rebuttal witnesses) following the statement by Dr. Lamphere in his testimony that appellant was characteristically a passive man. The specific testimony of witness Slipper to which appellant mainly objects now on appeal was brought out by appellant's own counsel at trial during cross-examination. There was no motion to strike the answer nor any objection to it, nor was there even a discussion with the court as to the prejudicial effect of the answer. Neither was there any objection to witness Steincipher's testimony or any other motions made by which the claimed error was brought to the trial court's attention. *State v. Miller, supra,* controls the issue as it pertains to the admissibility of Mr. Steincipher's testimony and Mr. Slipper's answers on cross-examination.

Appellant's sixth assignment of error claims that the direct rebuttal testimony of Mr. Slipper was not relevant and was not proper rebuttal testimony.

■ At the start of the direct examination of Mr. Slipper, an objection was made by defense counsel at trial to the effect that testimony about the reputation of appellant was not admissible because appellant had not put in issue his reputation as a law-abiding and peaceful person in his community. The trial court overruled the objection. We believe the trial court was correct. Dr. Lamphere's testimony included the statement that appellant was characteristically a passive man. Whether appellant was a passive man was at issue, and the evidence as to his reputation as a quarrelsome man in the community in which he lived was relevant thereto, and, therefore, was admissible.

Furthermore, such evidence is relevant and admissible as rebuttal evidence in connection with a defense of insanity. See *State v. Odell,* 38 Wn.2d 4, 227 P.2d 710 (1951). In that case, we quoted from 1 Wharton, Criminal Evidence § 318, at 428 (11th ed., 1935) as follows:

> When mental irresponsibility is interposed as a defense for a criminal act, great latitude is allowed in proving the mental condition of the accused. Both the state and the defendant may go to great length in offering evidence

as to acts, conditions, and conduct of the accused, not only at the time of the offense, but prior and subsequent thereto.

This statement represents the general rule in this jurisdiction.[1]

Appellant's fifth assignment of error is that it was error to cross-examine appellant by asking him the question, "Have you ever been convicted of a crime?" and with particular emphasis on the question "Wasn't this crime threatening to kill your wife?" Appellant moved for a mistrial at this point in the case on the ground that this was improper questioning concerning prior crimes. Respondent justified this questioning on the ground that it was permissible to bring out testimony regarding appellant's past actions which tend to show his quarrelsome nature. Such information, it was claimed, was appropriate as rebuttal evidence to show that appellant was not a "passive" man.

■ We agree with respondent that this information was relevant to show that appellant was not a "passive" man. He had claimed as a part of the proof of his defense of temporary insanity that he was characteristically a passive man. Any evidence of a prior crime tending to show that he either was or was not characteristically a passive man was relevant. *State v. Odell, supra.* We also notice that appellant did not appear to recall that he had ever been convicted of a crime. Much of the detailed questioning by the prosecutor was due to the fact that appellant did not appear to recall the nature of the charge on which he had previously

---

[1] In 1 Wharton, Criminal Evidence, § 213, at 434 (12th ed., 1955) a revised statement of the rule reads:

"Great latitude is allowed in the admission of evidence as relevant to the issue of insanity, particularly when the insanity claimed is of a temporary nature or is interrupted by lucid intervals. Although the evidence must be directed to show insanity at the time of the commission of the crime, it is relevant to show acts, conditions, and conduct of the accused both at the time of the offense and prior and subsequent thereto; . . . . ."

The statement is expanded in the supplement of that volume. We believe these later statements are simply expanded explanations of the same general rule.

been convicted. We believe that the "emphasis" placed on the questioning was at least partly due to the prosecutor's attempt to bring out the facts which appellant appeared not to recall immediately. This does not appear to be a deliberate attempt to inflame or prejudice the jury against this appellant, but rather an attempt to bring out rebuttal evidence by cross-examination of appellant. The evidence was relevant and the emphasis was due to appellant's own lack of memory. There was no error committed by the trial court in admitting this testimony and in refusing to declare a mistrial because of the questioning.

In connection with appellant's assignments of error Nos. 2 and 3, appellant made formal assignment of error regarding the trial court's instructions Nos. 14, 20, and 21. No exceptions were taken to these instructions at trial, and, therefore, we shall not consider such possible errors on appeal. See *State v. Harris*, 62 Wn.2d 858, 385 P.2d 18 (1963). The collective effect of these and other instructions were argued in his brief in connection with appellant's argument that it was error not to instruct the jury with regard to manslaughter. We have considered the collective effect of these instructions in so far as it was relevant under the first assignment of error, and find no reason why the proposed manslaughter instruction should have been given.

Appellant's counsel on appeal has made very careful and thoughtful arguments, but none of the assignments of error provide a ground for reversal of appellant's conviction of second-degree murder.

Therefore, the judgment and sentence of the trial court is affirmed.

ROSELLINI, C. J., HILL, WEAVER, and HAMILTON, JJ., concur.

November 3, 1966. Petition for rehearing denied.