[No. 48302-7. En Banc. November 10, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. DUDLEY
MARK BONDS, *Appellant.*

2

*Yvonne Huggins–McLean* and *Mark Leemon* of *Seattle–King County Public Defender Association,* for appellant.

*Arthur D. Curtis, Prosecuting Attorney,* and *Curtis A. Shelton, Deputy,* for respondent.

PEARSON, J.—Defendant Dudley Mark Bonds appeals his convictions of first degree murder, first degree rape, and first degree burglary. His appeal presents several issues: First, whether defendant's confession, made after a warrantless arrest by Washington police officers in Oregon, should be suppressed. Second, whether his conviction of both first degree rape and first degree burglary violated the constitutional proscription of double jeopardy. Third, whether his rape conviction should be set aside because the elements of the offense were not fully specified in the information or jury instructions. Finally, whether the admission at trial of testimony of a psychiatrist who was appointed to assist defendant at his juvenile decline hearing violated defendant's attorney–client privilege and privilege against self–incrimination. We affirm the convictions.

The facts are not seriously disputed. The crimes were committed in the evening of November 14, 1978. At that

time, defendant was 16 years old. He lived with his foster father and foster brothers in Vancouver, Washington. He was a senior at a Vancouver high school, and worked as a busboy at a restaurant in Portland, Oregon, just across the Columbia River. He also had a paper route.

On the evening of November 14, he left home to collect money from his paper route. Around 6 or 7 p.m., he arrived at the home of the victim, who was one of his customers. Defendant knew she was an elderly woman who lived alone. He believed she was wealthy. He broke a basement window, entered the basement, and searched for money. Finding nothing of value to him in the basement, he went upstairs, where he found a purse. He took $10 from the purse, and was returning it to where he found it when the victim noticed him. She recognized him and cried out that she would call his father and the police. The defendant knocked her down. He raped her. He struck her with a chair. Believing that he had killed her, he searched for the keys to her car. When the victim made a sound, and defendant realized he had not killed her, he struck her in the head with a pipe wrench. He wrapped the body in a blanket and placed it in the back of the victim's station wagon. At some time after the initial assault, he had put on a pair of gloves belonging to the victim so as not to leave fingerprints. He drove to a cemetery and left the body there. He drove to a railroad track and left the victim's car on the track. He then ran home and found the door locked. He slept in a trailer in the driveway.

In the early morning of November 15, the Vancouver police received a report of the car abandoned on the railroad tracks. A large quantity of blood was found in the back of the car. The police traced the car to the victim and investigated her residence. They found evidence of forcible entry through a basement window and signs of a violent struggle. Investigators at the residence learned from newspaper receipts that defendant was the victim's paper boy. On November 17, Detective Brown contacted the defendant's father and determined that defendant had not been at

home on the evening of November 14. Detective Brown interviewed defendant, who claimed to have been at a beer party with fellow high school students that evening. On November 18, defendant's father informed the police that he had run away from home. The father signed a runaway report, and turned over to the police an apparently blood-stained coat belonging to defendant. The police learned that defendant was employed at a Portland restaurant and that his payday for work performed prior to his disappearance was November 21, 1978.

On the morning of November 21, two detectives from the Vancouver Police Department went to the restaurant in Portland. They were told that defendant had come to the restaurant earlier that morning to ask for his paycheck. He had been told to come back later, as the check had not been prepared. The police officers proceeded to a nearby shopping mall, where they located defendant. After he confirmed his identity, defendant was told that he had been reported by his father as a runaway and that the officers wanted him to return with them to Vancouver. The detectives did not tell defendant that he was a suspect in a homicide and burglary, that he was being arrested for these crimes, or that they intended interrogating him regarding these crimes upon returning him to the Vancouver police station. Defendant asked the officers what would happen if he refused to return with them to Vancouver. They said he would be turned over to the Multnomah County, Oregon, juvenile authorities, who would detain him in their custody. Defendant then told the detectives that he would return with them to Vancouver. As the detectives accompanied defendant from the shopping mall to their vehicle, they told him not to run from them, and one of the officers took him by the upper arm and led him to the car. The detectives then drove defendant to the Vancouver police station. They did not explain to him that he had a right to contest in an Oregon court his return to the state of Washington. The officers had no warrant for defendant's arrest and no attempt had been made to obtain a warrant.

At the police station, an officer telephoned defendant's father and requested that he come to the station. While awaiting the arrival of the father, a detective read defendant the *Miranda* rights. After the father arrived, the *Miranda* rights were read again to both defendant and his father. The defendant and his father said they understood all of the rights. After about 20 minutes of questioning, a tape recorder was obtained and a tape recorded statement was taken from the defendant. Defendant was again informed of his rights, and he and his father both signed a waiver of rights prior to giving the recorded statement. In the statement, defendant admitted the facts set out earlier in this opinion. The victim's body was found in the cemetery where defendant said he had left it.

Defendant was charged with five felonies arising out of the events which culminated in the victim's death. Because defendant was only 16 years old at the time of these events, a juvenile decline hearing pursuant to RCW 13.40.110(1)(a) and JuCR 8.1 was held to determine whether defendant would be tried as an adult. To assist defense counsel in preparation for this hearing, the court ordered the appointment of Dr. Guy Parvaresh, a psychiatrist, and Dr. Dean Harris, a psychologist. On January 9 and 10, 1979, the juvenile court heard testimony and argument and declined jurisdiction. Defendant was remanded to Clark County Superior Court, where he was charged with first degree murder, first degree rape, and first degree burglary. He pleaded not guilty and not guilty by reason of insanity.

Prior to trial, a hearing was held pursuant to CrR 3.5 to determine the admissibility of the defendant's confession and other evidence obtained subsequent to defendant's arrest in Portland. The evidence was ruled admissible. Also prior to trial, defendant moved in limine against the State's using as a rebuttal witness Dr. Parvaresh, the psychiatrist appointed to assist the defense at the juvenile proceedings. The motion was denied.

At trial, defendant presented an insanity defense. A psychiatrist testified that defendant "went psychotic" and

"lost contact with reality" at the moment the victim disturbed him in her house and threatened to call the police and his father. A psychologist testified that when defendant attacked the victim, he was unable to distinguish right from wrong as defined by the law. The State called two psychiatrists in rebuttal. Dr. Parvaresh testified that although defendant had a mental impairment, he was not mentally ill; defendant was capable of forming the intent to kill and of distinguishing right from wrong. The State's other psychiatrist testified that defendant probably suffered a "psychotic or rage reaction" during the attack, but that he was capable of distinguishing right from wrong.

The jury convicted defendant of first degree murder, first degree rape, and first degree burglary. He appealed to the Court of Appeals and we accepted certification.

Defendant first argues that his warrantless arrest in Oregon and his removal into Washington were illegal, and that the confession obtained subsequent to the arrest should not have been admitted at his trial. The trial court refused to exclude the confession because it decided that although both the arrest and the transfer of defendant across the Washington–Oregon border violated Oregon law, neither the arrest nor the transfer was unconstitutional. The trial court concluded that the exclusionary rule would not apply where the irregularities in the arrest did not violate the constitution or any other law applicable within the state of Washington. We agree.

The Vancouver police officers violated Oregon law in arresting defendant and removing him to Washington. First, Oregon statutes were violated by the arrest. The police officers were not Oregon peace officers (Or. Rev. Stat. § 133.005(3)), or persons authorized by Oregon law to take juveniles into custody. Or. Rev. Stat. § 419.569(1). For purposes of Oregon law, they were only private citizens and could arrest only for offenses committed in their presence. Or. Rev. Stat. § 133.225. The arrest of defendant was not for an offense committed in their presence and therefore violated Oregon statutes.

Second, the officers made no attempt to comply with Oregon extradition procedures under the Interstate Compacts on Juveniles and Children; Juvenile Services (Or. Rev. Stat. § 417) and the Uniform Criminal Extradition Act (Or. Rev. Stat. §§ 133.743–133.992).

Defendant argues that his confession made subsequent to the illegal arrest and interstate rendition should be suppressed. We turn now to consider whether the exclusionary rule should be applied where the police have violated the laws of another state in apprehending defendant. This inquiry necessitates an appreciation of the scope and purposes of the exclusionary rule. The United States Supreme Court has declared that "[t]he exclusionary rule was a judicially created means of effectuating the rights secured by the Fourth Amendment". *Stone v. Powell*, 428 U.S. 465, 482, 49 L. Ed. 2d 1067, 96 S. Ct. 3037 (1976). The Fourth Amendment secures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures".

In the present case, there is no question of an unreasonable search of defendant. His argument is based on his arrest in Oregon. An arrest is "synonymous with those seizures governed by the Fourth Amendment". *Dunaway v. New York*, 442 U.S. 200, 208, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979). The standard for measuring the reasonableness of an arrest is probable cause. It is an absolute standard.

> The standard of probable cause thus represented the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest "reasonable" under the Fourth Amendment. The standard applied to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.

*Dunaway v. New York, supra* at 208.

One narrow exception to this rule is recognized in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), but otherwise the absolute rule remains intact. The same

standard of reasonableness is applied to the states through the Fourteenth Amendment. *Ker v. California,* 374 U.S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963).

It is undisputed in this case that the police officers had probable cause to arrest defendant. Therefore, although no warrant for his arrest had been obtained, the arrest met the standards of reasonableness prescribed by the Fourth Amendment. There is therefore no Fourth Amendment violation to require or justify the exclusion of defendant's confession.

In this state we have long recognized the exclusionary rule, applying it decades before *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961) made the rule applicable to the states. In *State v. Gibbons,* 118 Wash. 171, 188–89, 203 P. 390 (1922), this court asked rhetorically: "[H]ow can it be said that evidence procured in an unlawful manner through the violation of an accused's constitutional guaranty against unlawful search and seizure may be used against him . . .?" We have consistently held for 60 years that such evidence may not be used. In *State v. Miles,* 29 Wn.2d 921, 927, 190 P.2d 740 (1948), we said "[i]t is beneath the dignity of the state of Washington, and against public policy, for the state to use for its own profit any evidence that has been unlawfully obtained". In *Miles,* the court suppressed evidence obtained in a search following an arrest without probable cause. In *State v. O'Bremski,* 70 Wn.2d 425, 429, 423 P.2d 530 (1967) the exclusionary rule was described as

a command, judicially implied, intended to impose restraints upon law enforcement officers and to discourage abuse of authority when constitutional immunity from unreasonable search is involved.

However, we have not limited the exclusionary rule to protection of the constitutional immunity from unreasonable search (or seizure). We have consistently recognized the common law rule that a police officer, even with probable cause, may not arrest a person for a misdemeanor committed outside the presence of the officer, unless the officer has

a warrant. *State v. Greene,* 75 Wn.2d 519, 451 P.2d 926 (1969). This was the basis of our more recent decision in *State ex rel. McDonald v. Whatcom Cy. District Court,* 92 Wn.2d 35, 593 P.2d 546 (1979). *See Pasco v. Titus,* 26 Wn. App. 412, 613 P.2d 181 (1980). We have equally consistently suppressed evidence obtained pursuant to an unlawful misdemeanor arrest, without finding it necessary to determine whether such an arrest is constitutionally "unreasonable". *E.g., State v. Johnson,* 71 Wn.2d 239, 427 P.2d 705 (1967). An important reason for suppressing evidence from unlawful misdemeanor arrests is to discourage "pretext" arrests for misdemeanors in order to search for evidence of more serious offenses. *State v. Hehman,* 90 Wn.2d 45, 578 P.2d 527 (1978). The exclusionary rule has also been applied when a statute is violated in the course of obtaining evidence. In some cases, the statute itself provides that evidence obtained in violation of its provisions shall be inadmissible, *e.g.,* RCW 9.73.050. *State v. Williams,* 94 Wn.2d 531, 617 P.2d 1012 (1980). However, even where the statute does not specifically provide for inadmissibility, the exclusionary rule has been applied where no other remedy is available for enforcement of the statutory requirements. *State v. Krieg,* 7 Wn. App. 20, 497 P.2d 621 (1972). In sum, therefore, we have extended the exclusionary rule beyond the original Fourth Amendment context.

█ We have not, however, previously had the opportunity to consider the application of the exclusionary rule where the arresting officers violate, not statutes of this state, but statutes of a neighboring state. Arguably, such an arrest is illegal and therefore justifies the application of the exclusionary rule without further discussion. Certainly pronouncements in some of our opinions might suggest that any illegality in the obtaining of evidence mandates suppression. *E.g., State v. Miles, supra.* However, we decline to mechanically apply the exclusionary rule in this case without considering whether the benefits to be obtained from its application outweigh the costs imposed.

By balancing the competing costs and benefits in this

case, we do not intend to suggest that such a balancing should be carried out whenever the operation of the exclusionary rule is an issue. When evidence is obtained in violation of the defendant's constitutional immunity from unreasonable searches and seizures, there is no need to balance the particular circumstances and interests involved. *Dunaway v. New York, supra.* Evidence obtained as a result of an unreasonable search or seizure must be suppressed. However, where evidence is obtained through an illegality which falls short of a violation of the defendant's constitutional immunity, and where no violation of this state's laws has occurred, we hold that balancing of the costs and benefits of exclusion is appropriate. *See Stone v. Powell,* 428 U.S. at 488. The illegally obtained evidence should be suppressed unless the costs of suppression in the particular case outweigh the benefits achieved by suppression.

■ The costs of the exclusionary rule have been much discussed. *See, e.g., Stone v. Powell,* 428 U.S. at 489 n.27. The Supreme Court summarized these costs thus:

> the focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant. . . . Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice.

(Footnotes omitted.) *Stone v. Powell,* 428 U.S. at 489–90. The rule is applied, despite these costs, in order to achieve highly desirable objectives. The United States Supreme Court views the primary purpose of the rule as the deterrence of police conduct that violates Fourth Amendment rights. *Stone v. Powell,* 428 U.S. at 486. We recently indi-

cated that we view the purpose of the exclusionary rule from a slightly different perspective than does the United States Supreme Court. In *State v. White,* 97 Wn.2d 92, 640 P.2d 1061 (1982), we concluded that our state constitution, article 1, section 7, provides more expansive protection of the individual than does its counterpart, the Fourth Amendment. We pointed out that Const. art. 1, § 7 recognizes an individual's right of privacy with no express limitations.

> We think the language of our state constitutional provision constitutes a mandate that the right of privacy shall not be diminished by the judicial gloss of a selectively applied exclusionary remedy. In other words, the emphasis is on protecting personal rights rather than on curbing governmental actions. . . . The important place of the right to privacy in Const. art. 1, § 7 seems to us to require that whenever the right is unreasonably violated, the remedy must follow.

(Footnote omitted.) *State v. White,* 97 Wn.2d at 110. In a footnote in *White,* we recognized two other purposes of the rule: deterrence of police misconduct and the preservation of judicial dignity. 97 Wn.2d at 109 n.8.

In sum, therefore, the exclusionary rule should be applied to achieve three objectives: first, and most important, to protect privacy interests of individuals against unreasonable governmental intrusions; second, to deter the police from acting unlawfully in obtaining evidence; and third, to preserve the dignity of the judiciary by refusing to consider evidence which has been obtained through illegal means. We now proceed to consider the extent to which these objectives would be attained by excluding the confession in the present case.

The privacy interests of individuals against unreasonable intrusions are protected in this state by the requirement that to be constitutionally valid an arrest must be reasonable. And an arrest is reasonable only if the person making the arrest has probable cause. *State v. Scott,* 93 Wn.2d 7, 10–11, 604 P.2d 943 (1980). This rule applies even if the person making the arrest is a private citizen. *State v. Jack,*

63 Wn.2d 632, 388 P.2d 566 (1964); *State v. Harp*, 13 Wn. App. 239, 534 P.2d 842 (1975). In the present case, the police officers who arrested defendant had probable cause to believe he had committed a felony in Washington. They therefore satisfied the criterion by which this state judges the reasonableness of arrests. The officers fell short only of the Oregon rule that a private citizen may not arrest for a felony committed out of his presence. This rule goes beyond what we consider necessary to protect the privacy interests of individuals. Its violation therefore does not represent the kind of intrusion that the exclusionary rule is designed to prevent. Application of the rule in this case would therefore not advance the primary purpose which underlies the rule.

However, the second and third purposes of the rule might be served by application of the rule in this case. Unauthorized police excursions into neighboring states would certainly be deterred by a refusal to admit evidence obtained as a result of such activities. However, we feel that in this case alternative deterrents are available. The police officers concede that they were acting as private citizens in Oregon and therefore may well be exposed to civilian criminal or civil liability for unlawful arrest under Oregon law. Even police officers may suffer civil liability if the civil rights of the arrested person are violated. *See Street v. Cherba*, 662 F.2d 1037 (4th Cir. 1981). If such potential liability does not constitute sufficient deterrence of police officers' making unauthorized excursions into another jurisdiction, let it be understood that we will not hesitate in the future to use our supervisory power to exclude the fruits of such unauthorized excursions. *See United States v. Payner*, 447 U.S. 727, 735 n.7, 65 L. Ed. 2d 468, 100 S. Ct. 2439 (1980).

The final purpose of the rule, preservation of judicial integrity, would also be served by the application of the rule. However, this consideration is not absolute (*Stone v. Powell, supra*) and in this case is mitigated somewhat by the arrest being consistent with standards recognized by

this court.

We turn now to consider the costs of applying the rule. These are substantial. Defendant's confession was crucial to the State's case against him. It implicated him in three terrible crimes. It is not claimed that the illegality impaired the credibility of the confession. Suppression would threaten the State's entire case against defendant, whose guilt is not questioned. We have little hesitation in concluding that these costs clearly outweigh the limited benefits which would be obtained from excluding the confession because of the illegal arrest.

 The second phase of the police officers' illegal conduct was the return of defendant to Washington. The officers cavalierly ignored Oregon extradition proceedings and summarily removed defendant across the Columbia River into Washington. However, such illegality does not constitute a violation of due process. *Gerstein v. Pugh,* 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975); *Frisbie v. Collins,* 342 U.S. 519, 96 L. Ed. 541, 72 S. Ct. 509 (1952); *Mahon v. Justice,* 127 U.S. 700, 32 L. Ed. 283, 8 S. Ct. 1204 (1888); *Ker v. Illinois,* 119 U.S. 436, 30 L. Ed. 421, 7 S. Ct. 225 (1886). Nor, in our opinion, does it constitute reason for the operation of the exclusionary rule. The summary removal of defendant into Washington took only a few minutes and was accomplished peacefully, without threats and with defendant's concurrence. The improper interstate rendition was merely incidental to the arrest and represented no new intrusion into defendant's privacy. It represented more of an affront to the rights of the State of Oregon than of the defendant. Accordingly, we conclude that the fact that the arrest was followed by a violation of Oregon extradition procedures does not shift the balance of costs and benefits which we have already discussed. We therefore affirm the trial court's refusal to suppress defendant's confession.

We do not, by admitting defendant's confession, in any way condone the extraterritorial activities of the police officers in this case. It is disturbing that two experienced officers should pay so little heed to the limits of their

jurisdiction and blithely cross a state border to arrest a suspect.[1] Although the blatant violation of Oregon laws did not warrant exclusion of the evidence in this case, we reiterate our determination to exercise our supervisory powers to exclude evidence for such violations in the future. *See People v. Wolf*, 635 P.2d 213 (Colo. 1981) (Colorado Supreme Court places police officers on notice that violations of jurisdictional limits will result in the exercise of supervisory power).

Defendant next argues that his conviction of both first degree rape and first degree burglary was improper. He argues that the crime of burglary became "merged" with the completed crime of rape and that it was not proper to convict him of burglary in addition to rape. Merger is a rule of statutory interpretation. *State v. Thompson*, 88 Wn.2d 13, 17, 558 P.2d 202 (1977). In *State v. Johnson*, 92 Wn.2d 671, 681, 600 P.2d 1249 (1979), we held that crimes of kidnapping and assault, committed contemporaneously with the rape and for the sole purpose of effectuating sexual intercourse, became merged in the completed crime of first degree rape. We arrived at this conclusion after considering the legislative intent underlying RCW 9A.44.040. In that case, we had no direct expression of the Legislature's intent to guide us. In the present case, the Legislature has expressed its intent directly. RCW 9A.52.050 provides:

> Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately.

The Court of Appeals in *State v. Hoyt*, 29 Wn. App. 372, 377–78, 628 P.2d 515 (1981) said:

> the antimerger statute is an express statement that the legislature intended to punish separately any other crime committed during the course of a burglary.

We agree. The Legislature has clearly spoken on the issue and therefore burglary does not merge with first degree

---

[1]There was no claim of fresh pursuit. RCW 10.89.

rape.

 Defendant argues also that his conviction of both rape and burglary violates the constitutional proscription of double jeopardy, because both offenses stemmed from the same incident. We have recently held that "there is no constitutional double jeopardy nor multiple punishment policy issue where the sentences on crimes charged for the same act are made to run concurrently". *State v. Johnson*, 96 Wn.2d 926, 932, 639 P.2d 1332 (1982). Defendant received concurrent life sentences for his three offenses. Consequently, his double jeopardy claim is without merit.

 Defendant challenges his conviction of first degree rape on the grounds that the information charging him with the offense was insufficient and the jury instructions were inadequate. The information charged defendant

> did engage in sexual intercourse by forcible compulsion . . . did inflict serious physical injury upon the victim and did feloniously enter the building where said victim was located.

Defendant argues that the information was constitutionally deficient because it failed to allege a crime he intended to commit when he feloniously entered the building where the victim was located. We disagree. A criminal charge may be so vague as to fail to state any offense whatsoever. In this event, the charge is constitutionally defective and subject to dismissal. *In re Richard*, 75 Wn.2d 208, 211, 449 P.2d 809 (1969). The charge fails to state an offense if it omits a specified element of a statutory crime. *See State v. Ashker*, 11 Wn. App. 423, 426, 523 P.2d 949 (1974). In the instant case, the information contained the essential elements of first degree rape. RCW 9A.44.040(1) provides:

> A person is guilty of rape in the first degree when such person engages in sexual intercourse with another person not married to the perpetrator by forcible compulsion where the perpetrator or an accessory:
> (a) Uses or threatens to use a deadly weapon; or
> (b) Kidnaps the victim; or
> (c) Inflicts serious physical injury; or

(d) Feloniously enters into the building or vehicle where the victim is situated.

The information accurately stated these elements, and is therefore not constitutionally defective. However, a criminal charge may state an offense but be so vague as to particulars as to render it subject to a timely motion for a more definite statement. In this event, the charge is not subject to dismissal unless the prosecuting officials refuse to comply with an order calling for greater particularity. *In re Richard, supra.* If defendant considered it necessary for the information to specify the crime defendant intended to commit, the appropriate procedure was to request an order calling for amendment of the information. No such order was requested in this case, and therefore defendant cannot raise alleged deficiencies on appeal.

We turn now to defendant's challenge to the jury instruction on first degree rape. The jury was instructed that in order to convict defendant of first degree rape it was necessary to find that defendant either inflicted serious physical injury or unlawfully entered the building where the victim was situated with intent to commit a crime against a person or property therein. Defendant contends that because the instruction failed to specify what crime he intended to commit when he "unlawfully entered the building," the members of the jury may not have based their findings of guilt on the same crime and thereby returned a verdict which was not unanimous. Recently this court rejected a similar argument and upheld a jury instruction which set out two alternative methods of committing an offense. *State v. Franco,* 96 Wn.2d 816, 639 P.2d 1320 (1982). We held that

> where a single offense is committable in more than one way, it is unnecessary to a guilty verdict that there be more than unanimity concerning guilt as to the single crime charged, provided there is substantial evidence to support each of the means charged.

96 Wn.2d at 823.

■■ However, in the instant case, there is no way to

establish which crimes the jury relied on, much less determine that there is substantial evidence to support them. The jury was given a choice, not between two alternatives as in *Franco,* but of the entire catalog of criminal offenses. One might speculate that the crime was probably one of murder, assault, or robbery, but the instructions did not limit the jury to these. The instruction was, therefore, constitutionally defective. However, the error was harmless. The jury found defendant guilty of first degree murder of the victim, and must therefore have unanimously agreed that the defendant inflicted "serious physical injury" on the victim. This is sufficient to satisfy the alternative method of committing first degree rape. We can therefore conclude confidently that the erroneous instruction in no way affected the outcome of the case. *State v. Savage,* 94 Wn.2d 569, 578, 618 P.2d 82 (1980).

The final issue raised by defendant is the admissibility of the testimony of the State's rebuttal witness, Dr. Guy Parvaresh. Dr. Parvaresh was appointed as a medical expert to assist defense counsel at the juvenile decline hearing. After the juvenile court declined jurisdiction, the defense moved in limine to prevent the State's calling Dr. Parvaresh as a witness at defendant's trial. The court concluded that the attorney–client privilege between defendant and his counsel extended to Dr. Parvaresh and that communications between defendant and Dr. Parvaresh were within that privilege. However, the court determined that defendant had waived the privilege by calling Dr. Parvaresh as a defense witness at the juvenile decline hearing. The motion in limine was declined accordingly.

The parties apparently agree with the trial court's conclusion that the attorney–client privilege extended to Dr. Parvaresh because he was appointed pursuant to JuCR 9.3(a). Defendant argues that the privilege precluded Dr. Parvaresh from testifying against defendant. However, his argument goes beyond the admissibility of privileged communications. Defendant argues that his Fifth Amendment privilege against self–incrimination was violated by the tes-

timony of Dr. Parvaresh. Although defendant argues that the two privileges are intertwined, we find that a rational resolution of the issue can be achieved only by disentangling them.

We deal first with the Fifth Amendment privilege. Some background is necessary to appreciate defendant's argument. Dr. Parvaresh was appointed to assist defense counsel in preparing for the hearing held pursuant to RCW 13.40.110. The hearing is to enable the juvenile court to decide whether to decline jurisdiction over the juvenile defendant and transfer him for adult prosecution. Due process requires that such a hearing be held before juvenile jurisdiction is declined, that the defendant is entitled to counsel, and that the juvenile court give reasons for its decision. *Kent v. United States,* 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966). The determinative factors to be considered by the juvenile court at a decline hearing have been specified by the Supreme Court. 383 U.S. at 566–67. These factors include: "Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner" and "[t]he sophistication and maturity of the juvenile as determined by consideration of his . . . emotional attitude . . ." 383 U.S. at 567. In many cases, consideration of these factors requires the assistance of experts, such as psychologists and psychiatrists. In order to provide such assistance whenever it is necessary, JuCR 9.3(a) provides that

> A juvenile who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense may request that these services be provided at public expense . . .

Dr. Parvaresh was appointed pursuant to this rule to assist defense counsel in determining whether the offenses were premeditated, and in evaluating defendant's sophistication and maturity. Dr. Parvaresh interviewed defendant for 3 hours. During the interview, while exploring defendant's mental state at the time of the offenses, Dr. Parvaresh elicited incriminating statements from defendant. Dr. Par-

varesh testified at the decline hearing in favor of retaining juvenile jurisdiction over defendant.

Defendant argues that a constitutional dilemma is created by admitting Dr. Parvaresh's testimony at the adult trial. By exercising his due process rights to the assistance of Dr. Parvaresh at his juvenile hearing, defendant argues he gave up his Fifth Amendment privilege to prevent his own agent's becoming a witness against him. Defendant claims that this is exactly the type of mandatory constitutional right swapping that was condemned in *Simmons v. United States,* 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968). We disagree.

■■■ The United States Supreme Court has stated that "[t]he fact that respondent's statements were uttered in the context of a psychiatric examination does not automatically remove them from the reach of the Fifth Amendment". *Estelle v. Smith,* 451 U.S. 454, 465, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981). The Court went on to say, however:

> When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist.

The Supreme Court thus recognizes that statements uttered in the context of a psychiatric examination are removed from the reach of the Fifth Amendment when the defendant raises the insanity defense. We hold accordingly that Dr. Parvaresh's testimony was not protected by the Fifth Amendment.

■■■ The second aspect of defendant's argument is that Dr. Parvaresh's testimony was protected by the attorney–client privilege. Because Dr. Parvaresh was part of the defense team in the juvenile proceedings, defendant argues the attorney–client privilege recognized by RCW 5.60.060 should extend to him. However, the privilege is not abso-

lute. "Its ultimate application requires a balancing of the benefits of the privilege against the public interest of a full revelation of all the facts." *In re Henderson,* 29 Wn. App. 748, 753, 630 P.2d 944 (1981). A complete and convincing discussion of why full disclosure outweighs the benefits of the privilege is made in Saltzburg, *Privileges and Professionals: Lawyers and Psychiatrists,* 66 Va. L. Rev. 597, 635–42 (1980). Briefly, Saltzburg argues that the defense psychiatrist's examination of defendant is likely to be more accurate on the issue of insanity than that of the prosecution's. The defense psychiatrist will generally examine defendant earlier than the prosecution. The examination will thus be closer to the time of the offense, when defendant's recollections are clearer and there is less likelihood that defendant's mental condition has changed. Moreover, a defendant might benefit by undergoing several psychiatric examinations, examining reports of psychiatrists unfavorable to his insanity defense, and tailoring his responses in subsequent examinations more favorably to his defense. Defendant is also likely to be more cooperative with his own psychiatrist and give a more accurate impression of his mental condition. Saltzburg argues, and we agree, that for these reasons all available evidence of defendant's mental condition should be put before the jury. We have recognized in other cases that great latitude should be allowed in the admission of evidence relevant to the issue of insanity. *State v. Johnson,* 69 Wn.2d 264, 275 n.1, 418 P.2d 238 (1966). Accordingly, we have held admissible defendant's refusal to be examined by the State's psychiatrist. *State v. Huson,* 73 Wn.2d 660, 440 P.2d 192 (1968), *cert. denied,* 393 U.S. 1096, 21 L. Ed. 2d 787, 89 S. Ct. 886 (1969). And, in a prosecution for murder in which defendant entered a plea of insanity, we held that the State had the right on rebuttal to introduce evidence concerning a prior conviction of rape, including a confession giving the details of the crime. *State v. Odell,* 38 Wn.2d 4, 227 P.2d 710 (1951). The principle underlying these decisions has been stated thus:

[B]ecause of defendant's special plea of mental irresponsibility, anything said or done by him was relevant to his mental condition and therefore admissible. *State v. Huson,* 73 Wn.2d at 667. "Under the stated plea, every act of the defendant's life was admissible . . ." *Huson,* at 666. Therefore, the attorney–client privilege should not extend to the testimony of a psychiatrist when the issue of insanity is raised by the defense.

The trial court did not err in admitting the testimony of Dr. Parvaresh.

We affirm defendant's conviction.

ROSELLINI, STAFFORD, DOLLIVER, and DIMMICK, JJ., concur.

BRACHTENBACH, C.J., concurs in the result.

UTTER, J. (dissenting)—The majority assumes no violation of the Fourth Amendment occurred in this case because probable cause existed to arrest appellant Bonds and, second, asserts this is a case of first impression considering the "application of the exclusionary rule where the arresting officers violate, not statutes of this state, but statutes of a neighboring state." Majority opinion, at 10. I disagree with both of these conclusions. The seizure of Bonds in Oregon and his rendition into this state violated both the Fourth Amendment and the laws of the states of Washington and Oregon. His confession, obtained as a result of these illegal acts, should have been suppressed under authority of both the federal and state constitutions.

I

The majority begins its analysis by stating "the arrest met the standards of reasonableness prescribed by the Fourth Amendment" because the arrest, while warrantless, was based on probable cause. Majority opinion, at 9. While the United States Supreme Court has stated a preference for arrest warrants when practicable, *Beck v. Ohio,* 379 U.S. 89, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964), failure to obtain an arrest warrant (which could easily have been done in

this case) does not violate the Fourth Amendment where probable cause exists for the arrest. *United States v. Watson*, 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976). The officers in this case not only arrested Bonds, they spirited him into this state from Oregon. The majority states in perfunctory fashion, "The improper interstate rendition was merely incidental to the arrest and represented no new intrusion into defendant's privacy." Majority opinion, at 14. While Bonds' illegal arrest may not have violated the Fourth Amendment, his illegal rendition into this state most certainly did.

In *Michigan v. Doran*, 439 U.S. 282, 58 L. Ed. 2d 521, 99 S. Ct. 530 (1978), the Supreme Court required a judicial finding of probable cause to justify extradition of an individual. While the majority did not discuss the Fourth Amendment, three concurring Justices identified the Fourth Amendment as the constitutional basis for requiring a judicial finding of probable cause. The concurring Justices interpreted the majority opinion, as I think one must, as assuming the Fourth Amendment applies to extradition arrests without addressing that assumption. 439 U.S. at 293 n.3. Authoritative federal cases have been less timid in finding explicitly that the Fourth Amendment applies to extradition arrests. *Kirkland v. Preston*, 385 F.2d 670 (D.C. Cir. 1967); *Ierardi v. Gunter*, 528 F.2d 929 (1st Cir. 1976). The *Doran* holding struck a balance between the extradition clause's requirements of expedition and the Fourth Amendment's safeguards against unreasonable searches and seizures. 439 U.S. at 298.

If the Fourth Amendment applies to legal extradition procedures, it must as well apply to illegal acts of extradition. The implication of the majority's perfunctory treatment of Bonds' illegal rendition as "incidental" to the arrest and thus not significant for Fourth Amendment purposes is to give police officers an incentive to illegally spirit criminal suspects into this state to circumvent the requirements of the Fourth Amendment. By illegally rendering Bonds into this state without benefit of a judicial finding of

probable cause, the officers violated the Fourth Amendment. *Michigan v. Doran, supra; Kirkland v. Preston, supra; Ierardi v. Gunter, supra.*

## II

Even if I were to assume that the federal constitution does not command the above result, state law cited by the majority most certainly does.

The majority correctly surmises that this state has applied the exclusionary rule beyond the scope of federal law. Our state constitution provides:

> No person shall be disturbed in his private affairs, or his home invaded, *without authority of law.*

(Italics mine.) Const. art. 1, § 7. We have consistently applied the exclusionary rule where probable cause exists but evidence has been obtained "without authority of law." *See State ex rel. McDonald v. Whatcom Cy. District Court,* 92 Wn.2d 35, 593 P.2d 546 (1979); *State v. Johnson,* 71 Wn.2d 239, 427 P.2d 705 (1967); *Pasco v. Titus,* 26 Wn. App. 412, 613 P.2d 181 (1980). *See also State v. Hehman,* 90 Wn.2d 45, 578 P.2d 527 (1978); *State v. Miles,* 29 Wn.2d 921, 190 P.2d 740 (1948); *State v. Krieg,* 7 Wn. App. 20, 497 P.2d 621 (1972). These cases stand for the proposition that where a statute imposes requirements for arrest, even where probable cause exists, we will suppress evidence obtained pursuant to an arrest that fails to follow those legal requirements. Most jurisdictions suppress evidence obtained in a search incident to an arrest which is illegal only in the sense that it is contrary to a state provision on when an arrest warrant is required. *See United States v. Bonds,* 422 F.2d 660 (8th Cir. 1970); *Commonwealth v. Conway,* 2 Mass. App. Ct. 547, 316 N.E.2d 757 (1974); *Commonwealth v. Brown,* 225 Pa. Super. 289, 302 A.2d 475 (1973); *State v. Haigh,* 112 R.I. 740, 315 A.2d 431 (1974); 2 W. LaFave, *Search and Seizure* § 5.1, at 232 (1978).

The majority distinguishes the above authorities by viewing this case as one of first impression involving the application of the exclusionary rule when the arresting offi-

cers violate only a neighboring state's laws. This is incorrect.

Both the majority and the State concede the arrest and rendition of Bonds violated Oregon's laws. Since the police officers who arrested Bonds had probable cause to believe he had committed a felony in Washington, the majority concludes the officers "satisfied the criterion by which this state judges the reasonableness of arrests." Majority opinion, at 13. I agree with the majority that such probable cause would make the arrest legal in this state *if* it occurred in this state. But the arrest occurred in Oregon and the laws of Washington provide no legal authority for such an arrest. Private citizens may arrest a suspect in this state without a warrant upon probable cause that a felony has been committed, but no such Washington authority exists for arrests outside the state.

The power of police officers to arrest is solely a function of statutory authority. Washington's arrest statute permits arrests only in this state. RCW 10.31.100, 10.34.010. Indeed, the Legislature does not have the authority to empower police officers to act under color of law outside the state's boundaries. The out–of–state apprehension of a suspect may occur only by authority of the state in which the individual is apprehended. *See* Or. Rev. Stat. § 133.225 (law governing arrests by private persons); Or. Rev. Stat. § 133-.430 (law governing fresh pursuit); Or. Rev. Stat. § 133.805 (law governing extradition arrest). It is conceded by the majority that Bonds' arrest in Oregon did not comply with any of these laws. What the majority fails to recognize is that such arrest in Oregon also violated Washington law since no Washington statute can or does authorize arrests outside this state. The arrest by the officers in this case was quite simply "without authority of law" under both Oregon and Washington laws.

In addition to Bonds' unlawful arrest under Oregon and Washington laws, his extradition to this state violated both states' laws. As with arrest, the Legislature may not empower officers to bring individuals to this state after

their seizure out of state without the cooperation and authority of other states and their laws. Extradition from Oregon to Washington may occur only by virtue of RCW 10.34.030, providing that agents may be appointed by the Governor to demand the return of persons "charged with a felony or any other crime in this state", and Oregon's Uniform Criminal Extradition Act, providing for a response to this state's demand. Or. Rev. Stat. §§ 133.743–133.992. The officers in this case complied with neither law. For extradition to occur lawfully, an individual must be "charged" with a crime in the state for which extradition is sought. *See* Or. Rev. Stat. § 133.803; RCW 10.88.320, 10.34.030. A private person may make an extradition arrest without a warrant in both Oregon and Washington, but such individual must have "reasonable information that the accused *stands charged* in the courts of another state with a crime punishable by death or imprisonment for a term exceeding one year . . ." (Italics mine.) Or. Rev. Stat. § 133.805; RCW 10.88.330. While Bonds could have been charged with a crime and the officers had sufficient time to obtain an arrest warrant, no such charge was filed nor warrant obtained. Thus in apprehending Bonds and spiriting him into this state, both Oregon law (Or. Rev. Stat. § 133.805) and Washington law (RCW 10.34.030) were violated.

Both Oregon and Washington laws anticipate expedited procedures before a court after one is apprehended for purposes of extradition. RCW 10.34.030 provides for agents "to accept the voluntary surrender of any such person who has waived extradition", and Oregon law provides:

> [T]hat nothing in this section shall be deemed to limit the right of the accused person to submit voluntarily to the custody of such agent or agents for return without formality to the demanding state.

Or. Rev. Stat. § 133.843(2). *See also* RCW 10.88.430. The State contends no extradition law has been violated since Bonds waived extradition by consenting to his return. Not even the majority is brave enough to consider voluntary Bonds' consent to go with the officers. Such an assertion is

preposterous in light of the majority's acknowledgment that such voluntariness was manifested by Bonds' being escorted by the elbow and told not to run. Even if Bonds' consent were voluntary, it would not purge the illegality of the prior arrest. *See People v. Jacobs,* 67 Ill. App. 3d 447, 385 N.E.2d 137 (1979). On close examination, neither would it purge the illegality of the extradition under Washington and Oregon laws. Both states permit the voluntary return of a fugitive, but RCW 10.34.030 establishes the prerequisite that the person be "charged" and the Oregon law allows for a return "voluntarily" and "without formality" only after a demand has been made. Bonds had not been charged with a crime prior to his seizure and rendition, nor had this state made a demand for his removal. Both Washington and Oregon laws were violated, and even a voluntary consent in this case would not have legitimized Bonds' rendition into this state.

Having identified the ways in which the officers' seizure and rendition of Bonds violated both Washington and Oregon laws, I think resolution of this case is controlled by the state authorities the majority attempts to distinguish. *See State ex rel. McDonald v. Whatcom Cy. District Court, supra; State v. Johnson, supra; Pasco v. Titus, supra.* Both Oregon and Washington laws reflect the requirement of a charge filed against an individual before that individual may be legally extradited. Only where an out-of-state officer is in fresh pursuit of a suspect may he or she arrest outside state boundaries without a preexisting charge against the suspect. Bonds had not been charged with a crime nor had an arrest warrant issued at the time the officers unlawfully seized him. Such unlawful seizure of Bonds dictates suppression of any evidence obtained as a result of such unlawful acts.

The State contends that defendant's confession was sufficiently attenuated from any prior illegality to preclude the application of the exclusionary rule. In support of this contention, the State points out that defendant was properly advised of his *Miranda* rights prior to questioning and was

permitted to have his foster father present throughout the interrogation. The United States Supreme Court has set forth three factors to guide lower courts in determining attenuation: (1) the temporal proximity of arrest and confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975).

In this case, the first and third factors obviously favor suppression. Moreover, the intervening events relied upon by the State in connection with the second factor are not sufficient to purge defendant's confession of an illegal taint. The giving of a *Miranda* warning does not, in and of itself, constitute attenuation. *Brown v. Illinois, supra; State v. Byers,* 88 Wn.2d 1, 559 P.2d 1334 (1977). The presence of the foster father does not appear to be significant in light of the fact that he was not permitted to engage in any kind of private discussion with the defendant prior to the questioning. *Cf. Pennsylvania ex rel. Craig v. Maroney,* 348 F.2d 22 (3d Cir. 1965) (opportunity to meet with attorney prior to questioning constitutes sufficient attenuation). The defendant's confession should have been suppressed. *United States v. Crews,* 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244 (1980).

The seizure of Bonds in Oregon and his removal to this state violated both the Fourth Amendment and article 1, section 7 of our state constitution. Bonds' confession was not sufficiently attenuated from the illegality to justify denial of suppression. The above analysis precludes reaching the balancing test the majority creates for addressing its matter of first impression.[2] Such analysis also renders

---

[2]The balance struck by the majority nevertheless bears comment. The majority feels "alternative deterrents" to suppression exist in "this case"; namely, civil remedies against police officers. I submit such alternatives always exist, and we have heretofore found such alternatives inadequate. The burden of proof in such civil cases is not an easy one. *See Hocker v. Woody,* 95 Wn.2d 822, 631 P.2d 372 (1981). I can quote no better source than (then) Judge Pearson himself in a case where the Court of Appeals suppressed evidence stemming from an illegal arrest

superfluous the majority's admonition that the court will exercise its supervisory powers to suppress evidence if such police misconduct were to become habitual. While well meaning, such an admonition is merely empty rhetoric in the face of a constitutional directive to suppress evidence in this case.

## III

Finally, I concur with the majority's result in dealing with the admissibility of Dr. Parvaresh's testimony. I agree the attorney–client privilege was waived when the defendant placed Dr. Parvaresh on the stand at the declination hearing. The doctor's information was no longer confidential after that time. This seems to have been the position of the trial court in denying Bonds' motion in limine. Majority opinion, at 18. The majority goes further than the trial court in holding "the attorney–client privilege should not extend to the testimony of a psychiatrist when the issue of insanity is raised by the defense." Majority opinion, at 22. I disagree with this broad (and for purposes of this case unnecessary) assertion. An attorney must have the freedom to consult with and the defendant must feel free to communicate with a psychiatrist retained for the purposes of facilitating the attorney–client relationship. If the prosecution could call such a psychiatrist when the defendant raises the insanity defense even when such psychiatrist is not called as a witness at any prior proceeding of the case, the attorney–client relationship would be substantially inhibited. *See, e.g., City & Cy. of San Francisco v. Superior Court,* 37 Cal. 2d 227, 231 P.2d 26 (1951); *State v. Pratt,* 284 Md. 516, 398 A.2d 421 (1979); *United States ex rel.*

---

(for failure to give statutory warnings): "no remedy is presently available for enforcement of the statutory requirements, except to exclude the evidence unlawfully obtained." *State v. Krieg,* 7 Wn. App. 20, 26, 497 P.2d 621 (1972). As to the costs of suppression, I find the majority's discussion much too conclusory. The issue of suppression is usually consequential, or generally it will not reach us. While the confession might have been important, the majority discusses circumstantial evidence the prosecutor possessed, and there is simply no discussion of other evidence the prosecution may use in developing its case on remand.

*Edney v. Smith,* 425 F. Supp. 1038 (E.D.N.Y. 1976), *aff'd,* 556 F.2d 556 (2d Cir.), *cert. denied,* 431 U.S. 958 (1977).

WILLIAMS, J., and CUNNINGHAM, J. Pro Tem., concur with UTTER, J.

BRACHTENBACH, C.J., concurs with UTTER, J., as to part III.

Reconsideration denied January 26, 1983.