FILED
NOV 5, 2013
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30036-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAMON GARCIA MORALES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, C.J. — Idaho authorities arrested Ramon Garcia Morales on a valid

Washington first degree murder warrant after allegedly illegally determining where he

was located. We conclude that Mr. Morales's subsequent confession to Washington

authorities was too attenuated to be the fruit of an illegal search. We also conclude that

the trial court did not abuse its discretion in determining that Mr. Morales was competent

to stand trial despite his refusal to assist counsel, nor did it do so by denying a motion to

change venue. The convictions for first degree murder, attempted first degree murder,

and two counts of second degree assault are affirmed.

FACTS

Mr. Morales and his brother, Jose Garcia Morales, went to the home of Alfredo

Garcia, the reputed "onion kingpin" of an area farm on December 10, 2008. Mr. Morales

was upset that Mr. Garcia was not allowing him to work in the onion fields. Armed with

handguns, the two Morales brothers contacted Garcia with the hope of either gaining work for Ramon Morales or money. An argument ensued and Ramon Morales shot Alfredo Garcia six times, killing him. Mr. Garcia's wife, Maria Beatris Ramirez-deGarcia, was shot four times, including once in her head, when she attempted to place a telephone call for aid. She survived her wounds and identified Ramon Morales at trial as the shooter.

Attracted by the noise, the two Garcia daughters came to their parents' aid. Mr. Morales pointed his gun at both of them before he and his brother fled. The daughters told responding officers who the assailants were. Charges of first degree murder and attempted first degree murder were filed the next day.[1] Arrest warrants were issued for both brothers at that time.

Detective William Parramore of the Pasco Police Department knew the cell phone numbers for the Morales brothers; he contacted Sprint to obtain the current location of the phones. Sprint sent the detective an "exigency form," which he filled out and returned to the company. Sprint attempted to locate the telephones, but initially they were turned off. Sprint later determined that the phones were in Idaho and provided latitude and longitude coordinates to the detective. Thereafter, the detective regularly contacted Sprint (roughly every 15 minutes) for the current location of the telephone. Sprint would "ping" the

---

[1] Prior to trial, the charges were amended to add two counts of second degree assault of the two daughters and firearm enhancements for each of the four counts.

2

phones by sending a signal that the phone would return to the nearest cell tower. Eventually the detective was able to direct authorities in Elmore County, Idaho, to the location of the car containing the two brothers. Both were arrested and placed in a local jail. Ramon declined to talk to the arresting officer.

Detective Kirk Nebeker traveled to Elmore County with another detective and took custody of the two brothers. He interviewed Ramon Morales in Spanish after obtaining a waiver of his *Miranda*[2] rights. Mr. Morales told the detective that Mr. Garcia had excluded him from work and that he went to the house with the intention of obtaining money that he should have received or killing Mr. Garcia. However, after a long conversation, Mr. and Mrs. Garcia started striking the two Morales men, causing Ramon Morales to shoot both of the Garcias in self-defense. He denied pointing his gun at the daughters. He and his brother left and headed for California. After telling this story to the detective, Mr. Morales then wrote it out in his own words.

After returning to Franklin County, Mr. Morales entered not guilty pleas and the matter very slowly progressed toward trial. Defense counsel became concerned over lack of cooperation and called Mr. Morales's competency to stand trial into question. The trial court on May 18, 2009, ordered a competency evaluation. Dr. Nathan Henry of Eastern State Hospital travelled to the Franklin County Jail to evaluate Mr. Morales. An

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3

interpreter was used for the evaluation. Dr. Henry did not believe Mr. Morales was putting forth much effort and diagnosed him as a malingerer. The doctor could not assess Mr. Morales for competency or mental illness in light of the malingering.

Dr. Tedd Judd, a neuropsychologist, performed the defense evaluation on August 3. He determined that Mr. Morales, who cooperated with the evaluation, had mild mental retardation and was not competent to stand trial. Dr. Judd also thought there was possible psychosis and traumatic brain injury. Dr. Judd opined that the behavior Dr. Henry considered malingering was common among Mexicans suffering from mental illness.

Dr. Henry attempted a second evaluation on January 7, 2010. He again terminated the evaluation early because of malingering. Mr. Morales was withdrawn and uncooperative. Dr. Henry noted Dr. Judd's diagnoses but discounted the conditions as potential causes for Mr. Morales's withdrawn state.

The court ordered an inpatient evaluation as well as a developmental disability examination. These evaluations were conducted at Eastern State Hospital by Dr. Henry and Dr. Avery Nelson, a psychiatrist. Staff at the hospital observed that Mr. Morales did not speak, slept through meals, attempted to eat a salad dressing packet, required assistance with personal hygiene, did not interact with staff or patients, and appeared depressed and withdrawn. Dr. Nelson provided a rule out diagnosis of psychosis NOS and prescribed lithium to treat the symptoms of depression and catatonic withdrawal. In his interview with Dr. Henry, Mr. Morales was quieter and less responsive than ever,

causing Dr. Henry to again terminate the evaluation early. Without a firm diagnosis of mental illness and without an opportunity to perform a full evaluation, Dr. Henry deferred to his previous findings of malingering and incompetency.

The trial court conducted a competency hearing on August 18, 2010 and determined that Mr. Morales was competent to stand trial. The following month defense counsel twice filed motions for appointment of a guardian ad litem due to Mr. Morales's inability to assist in his own defense. The motions were denied October 12, 2010. Counsel subsequently was twice denied permission to withdraw from representation due to lack of communication with Mr. Morales.

Dr. Henry reevaluated Mr. Morales on March 9, 2011. Mr. Morales presented even less responsive and more disheveled than ever. Again, Dr. Henry deferred to his initial August 3, 2009 report and its findings of malingering and incompetency because he believed that Mr. Morales's "lack of communication is best attributed to elective mutism (choosing not to speak)." However, Dr. Henry did recommend a nonforensic mental health evaluation under chapter 71.05 RCW because of "concerns regarding possible suicidality."

The trial court held another competency hearing on April 26, 2011. Dr. Henry testified at that hearing and explained that his opinion that Mr. Morales was feigning competency related impairment was "a qualified, yes." Dr. Henry explained that Mr. Morales was not actively feigning during the interview nor was he feigning his

5

deteriorating physical condition. However, Dr. Henry stood by his original competency

opinion in light of the only evidence he had. The trial court again found Mr. Morales

competent to stand trial.

Defense counsel filed a CrR 3.6 motion to suppress the defendant's statements on

the grounds that the arrest was the result of illegal cell phone tracking. After hearing

testimony, the court eventually denied the motion, reasoning that there was no reasonable

expectation of privacy in the cell tower "pings" off of the cell phone.[3]

Jury selection began with 72 potential jurors called for service. The parties jointly

challenged 27 jurors for cause; the court granted the challenges. The defense brought a

motion for change of venue due to pretrial publicity. The court heard argument and

denied the motion. By the time jury selection ended, the prosecution had used six of its

peremptory challenges and successfully excluded one juror for cause. The defense used

eight peremptory challenges and was able to excuse two more jurors for cause.

Ultimately, 14 of the remaining 27 members of the venire were selected to serve. None

of those jurors was challenged for cause.

The three surviving victims identified Mr. Morales as their assailant. The defense

argued the case on a self-defense theory that rested on the contents of Mr. Morales's

---

[3] Inexplicably, the findings required by CrR 3.6 were not entered until 14 months
after the hearing and one month after the brief of appellant was filed.

statement to Detective Nebeker. The jury rejected the self-defense argument and returned guilty verdicts on all four counts and also found all four firearm enhancements.

The defense again sought another competency evaluation prior to sentencing due to continued physical deterioration. The court denied the motion and ultimately imposed standard range sentences totaling 67 years. Mr. Morales then timely appealed to this court.

## ANALYSIS

This appeal presents challenges to the rulings on the suppression motion, the competency determinations, and the change of venue motion. We will address those issues in the noted order.

*Suppression Ruling*

Mr. Morales challenges the court's decision that there was no reasonable expectation of privacy in the cell tower "pings" on several bases. In particular, he contends that the action constituted an illegal search in violation of article I, section 7 of our constitution. The prosecutor replies that Mr. Morales had no standing to challenge Sprint's actions and that the statement given to police was too attenuated from any constitutional violation to be suppressed. We agree that the attenuation doctrine applies and conclude that the statement was not the product of an illegal search.

Prudential doctrines drive our approach. The parties have not briefed the extra-territorial application of article I, section 7 to the actions of Sprint, the "pinging" in

7

Idaho, and the arrest by Idaho authorities.[4] We also note that the Fourth Amendment, which is not argued by the parties, might apply to this case, particularly the activities that occurred in Idaho. Although no federal appellate courts have addressed the Fourth Amendment[5] in this circumstance, the federal trial courts have unanimously decided that a reasonable expectation of privacy exists in the real-time pings, and almost all have found that the same exists in historical ping data.[6] In the absence of comprehensive briefing of these topics, we will not address the validity of the search.

Instead, we will presume for purposes of this opinion that Mr. Morales's privacy was invaded by the tracking. There was no direct connection between the location of the

---

[4] The parties also have not addressed what privacy rights, if any, someone fleeing an arrest warrant may have. *See State v. Vy Thang*, 145 Wn.2d 630, 637, 41 P.3d 1159 (2002) (discussing privacy rights of escaped prisoner). An arrest warrant allows police to enter the suspect's home to effectuate an arrest. *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State v. Williams*, 142 Wn.2d 17, 11 P.3d 714 (2000). An arrest warrant is also a valid basis for stopping a motor vehicle to effectuate service of the arrest warrant. *State v. Bliss*, 153 Wn. App. 197, 204, 222 P.3d 107 (2009). It would be curious that Mr. Morales might have more privacy interest in the cell phone pinging than he would have in the car in which he was arrested.

[5] For an excellent discussion of modern cell phone technology while considering the tracking issue on state constitutional grounds, see *State v. Earls*, 214 N.J. 564, 70 A.3d 630 (2013).

[6] *In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526 (D. Md. 2011) (finding that suspects have a Fourth Amendment reasonable expectation of privacy in their cell phone "pings"); *In re U.S. for an Order Authorizing the Release of Historical Cell-Site Info.*, 809 F. Supp. 2d 113 (E.D.N.Y. 2011) (same); *In re Application of U.S. for an Order Authorizing Release of Historical Cell-Site Info.*, 736 F. Supp. 2d 578 (E.D.N.Y. 2010) (same); *In re Application of U.S. for an Order Authorizing Installation and Use of a Pen Register and a Caller Identification Sys.*, 402 F. Supp. 2d 597 (D. Md. 2005) (same).

fleeing men by the illegal means and the subsequent interrogation the following day by Washington authorities following the arrest on a valid warrant and the advice and waiver of *Miranda* rights. Thus, there was no direct exploitation of the illegality leading to the statement.

The United States Supreme Court applies the exclusionary rule to deter police misconduct rather than protect individual privacy rights. *Stone v. Powell*, 428 U.S. 465, 486, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976). When illegal police behavior directly leads to evidence of a crime, the evidence will be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 485-86, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). However, when the evidence is not directly the fruit of the police illegality, but merely follows after it in time, the evidence need not be excluded. *Id.* at 491-92. This is known as the attenuation doctrine. *Id.* at 491 (citing *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939)).

Washington applies its exclusionary rule for the purposes of both deterring misconduct and vindicating the right of privacy guaranteed by article I, section 7. *State v. Bonds*, 98 Wn.2d 1, 11-12, 653 P.2d 1024 (1982). Like the federal government, Washington will exclude evidence where it is directly discovered as a result of the police violation of article I, section 7.[7] *Id.* at 9. Washington also has repeatedly rejected a "but

---

[7] Washington first applied the exclusionary rule in *State v. Gibbons*, 118 Wash. 171, 203 P. 390 (1922). The United States Supreme Court did not require states to apply

9

for" test of causation that would require the suppression of any evidence discovered subsequent to an illegality. *E.g., State v. Mierz*, 127 Wn.2d 460, 474-75, 901 P.2d 286 (1995); *Bonds*, 98 Wn.2d at 10-14 (declining to suppress confession following illegal arrest and return from Oregon where officers had probable cause to make arrest); *State v. Vangen*, 72 Wn.2d 548, 554-55, 433 P.2d 691 (1967) (declining to suppress confession following allegedly improper arrest).

It is against this background that we must consider the effect of the illegal pinging on the subsequent confession.[8] This case is controlled by the decision in *State v. Eserjose*, 171 Wn.2d 907, 259 P.3d 172 (2011). There police, having probable cause to arrest the defendant for burglary, but no arrest warrant, were invited into the entryway of a house where the defendant was living with his parents. *Id.* at 910. After a delay, officers entered further into the house and arrested two men. Both were taken to separate police cars, advised of their *Miranda* rights, and subsequently transported to the sheriff's office. *Id.* at 910-11. At the office Mr. Eserjose was again advised of his *Miranda* rights

---

the exclusionary rule in search cases until *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[8] In light of our conclusion, we do not assess whether or not error in admitting the statement was harmless. The defense did not present a case and was able to obtain self-defense instructions and argue the case on that theory due to the statement Mr. Morales gave the police. In light of his subsequent lack of cooperation with counsel and the usefulness of the statement to the defense, it is doubtful that the evidence harmed Mr. Morales.

and questioned. After initially denying involvement in the burglary, Mr. Eserjose admitted his involvement when told that the codefendant had confessed. *Id.* at 911.

The sole issue on appeal to the Washington Supreme Court involved the admission of the confession. *Id.* at 912. The lead opinion for three justices concluded that the confession was attenuated from the unlawful arrest; a fourth justice concurred only in the result. *Id.* at 919-25, 929. The fifth vote came from the concurring opinion of Chief Justice Madsen. She concluded that the confession was not the direct result of the police illegality. *Id.* at 934. The four dissenting justices argued that attenuation was not a proper consideration under our state constitution. *Id.* at 934-40 (C. Johnson, J., dissenting).

In light of the outcome of *Eserjose*, Mr. Morales's statement was admissible in this case. The facts here are similar to, and even stronger than, those in *Eserjose*. Here not only did the officer have probable cause to arrest Mr. Morales for murder and attempted murder, a judicial officer had already reached that same determination and issued an arrest warrant. Mr. Morales made no statement to the Idaho officers, but gave his statement the following day to Washington officers who conversed with him in Spanish. The *Eserjose* facts were sufficient to establish either attenuation (lead opinion) or lack of direct causation (concurrence); the same result must occur here. Throw in the fact that the arrest warrant would have authorized officers to stop and arrest Mr. Morales in his car as he fled through Idaho, we do not believe that the lesser intrusion into his

11

privacy by the cell tower pinging could have justified suppression where the vehicle stop itself would not have.

On its facts, the statement in this case is even less deserving of suppression than that in *Everjose*. Accordingly, the trial court correctly denied the motion to suppress.[9]

We do note that just as Washington applied a suppression rule long before the United States Supreme Court required states to do so in Fourth Amendment cases, Washington also applied attenuation before *Wong Sun*. *State v. Rosseau*, 40 Wn.2d 92, 241 P.2d 447 (1952), *overruled on other grounds by State v. Valentine*, 132 Wn.2d 1, 935 P.2d 1294 (1997).

In *Rosseau*, an officer arrested a defendant after watching him attempt to pawn a watch using a false name, leading the officer to believe the watch was stolen property. 40 Wn.2d at 93. He searched the suspect and found additional watches, which the officer left in the custody of the defendant. As the officer was walking the defendant from the pawn shop to the jail, the suspect threw the officer into an oncoming car and fled. *Id.*

---

[9] A recent case in a somewhat similar vein is *State v. Smith*, 177 Wn.2d 533, 303 P.3d 1047 (2013). There police conducting an illegal search responded to a motel room and then entered to assist a bloodied assault victim. The four judge lead opinion found the entry into the room (and subsequently discovered evidence) was justified to provide aid, applying the search exception without regard to the prior illegality. *Id.* at 542 n.2. The three judge concurrence would have applied the attenuation doctrine to admit the testimony of the victims found in the room. *Id.* at 553-54 (Gonzales, J., concurring). Similarly, we do not think the unlawful discovery of Mr. Morales's whereabouts in Idaho tainted the execution of the arrest warrant.

12

The officer pursued and again arrested the suspect for assault. *Id.* at 93-94. A second search of the defendant again uncovered the stolen watches, one of which was tied to a burglary. *Id.* at 94. The defendant then confessed to the burglary that netted the stolen watch. *Id.* On appeal from a burglary conviction, the court assumed that the first arrest and search were illegal because the officer did not then know that the watch was stolen. *Id.* at 93-94. The court then turned to the question of whether "the second arrest and the search incidental thereto [were] lawful?" *Id.* at 94.

The court determined that Mr. Rousseau used "unnecessary force" in resisting the original arrest. *Id.* at 96. The court then stated its conclusion.

> Appellant was, therefore, lawfully arrested following the assault, and the Swiss watch found on him by the search that was an incident of that arrest was admissible in evidence against him on the present charge of burglary in the second degree. We therefore conclude that the judge who heard the motion to suppress the evidence did not err in denying that motion, and that the trial judge did not err in admitting the Swiss watch taken from the appellant as an exhibit in his trial on that charge.

*Id.*

Just as the second arrest in *Rousseau* was not tainted by the first arrest, even though it led to the discovery of the same evidence previously uncovered by the first arrest, we do not believe that the arrest on the warrant in this case was tainted by the improper method used to locate Mr. Morales to serve the warrant. There is even less argument for claiming that the statement given to different police officers the following day was the result of exploiting the cell tower pinging.

13

Accordingly, we believe the trial court properly denied the motion to suppress the statement given by Mr. Morales. There was no error.

*Competency*

Mr. Morales next argues that the trial court erred in finding that he was competent to stand trial in light of his deterioration over time.[10] While Mr. Morales's bizarre behavior certainly would have justified a finding of incompetence, the trial court was not required to enter such a finding. The court had tenable grounds to believe Mr. Morales was malingering.

We review a trial court's competency determination for abuse of discretion. *State v. Benn*, 120 Wn.2d 631, 662, 845 P.2d 289 (1993). Under that standard, "so long as the underlying adequacy of a given competency evaluation is 'fairly debatable,' the trial court has discretion to accept or reject that evaluation in satisfaction of RCW 10.77.060." *State v. Sisouvanh*, 175 Wn.2d 607, 623, 290 P.3d 942 (2012) (citations and quotations omitted). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

---

[10] Mr. Morales also argues that current RCW 10.77.010(15) is unconstitutional by requiring that incompetency result from mental illness. Although the argument is interesting, we need not address it here as it would have no apparent effect on this case. There has been no argument or evidence presented suggesting that incompetence can arise from some other cause than mental illness or that Mr. Morales was incompetent but not mentally ill. Similarly, the question of which party bears the burden of proof under the statute is not one we need decide as the court did not rely on a burden in making its competency determination.

14

Here, the trial court accepted the view of Dr. Henry that Mr. Morales was faking his condition. There was contrary evidence from Dr. Judd, and there was substantial evidence that Mr. Morales was not cooperating with counsel (or anyone else) and was behaving in a bizarre manner. This court, of course, does not weigh evidence, but only reviews to determine if the trial court had evidence to support its findings. *E.g.*, *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009). Stated another way, an appellate court is not in a position to find persuasive evidence that the trier of fact found unpersuasive. *Id.*

Dr. Henry determined that Mr. Morales was malingering and was thus unable to fully evaluate him. In the absence of history of mental illness or incompetency, Dr. Henry concluded Mr. Morales was competent. Although the trial judge was free to conclude otherwise, the court accepted Dr. Henry's opinion over that of Dr. Judd. It was an understandable decision. The onset of behavioral problems after the arrest was a suspicious coincidence that soon was followed by the apparently conscious decision to cooperate with Dr. Judd but not with Dr. Henry. Dr. Henry's theory of feigned illness was supported by the evidence just as Dr. Judd's theory of mental illness induced incompetency was. The trial court's decision was supported by evidence and, thus, had tenable grounds.

Mr. Morales's refusal to cooperate with counsel did not render him unable to stand trial. There was no abuse of discretion in permitting the case to go to trial.

15

*Change of Venue*

The final issue is a contention that the trial court erred in denying the motion for change of venue. Once again we conclude that the trial court did not abuse its discretion.

Decisions on motions to change venue are reviewed for abuse of discretion. *State v. Crudup*, 11 Wn. App. 583, 524 P.2d 479 (1974). Where a probability of prejudice in a given venue is shown, a venue change must be granted; actual prejudice is not required. *Id.* at 586. Criteria which courts examine in deciding venue change based on prejudicial pretrial publicity include:

> (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*Id.* at 587.

Mr. Morales did not argue these factors to the trial court, although he does in this appeal, and thus we have no analysis from the trial court of its weighing of these considerations. Nonetheless, our task here is different than that which the trial court faced. "The question is not whether this court would have decided otherwise in the first

16

instance, but whether the trial judge was justified in reaching his conclusion." *State v. Taylor*, 60 Wn.2d 32, 42, 371 P.2d 617 (1962).

We think that the trial court had very tenable reasons for denying the motion. The primary reason was that the petit jury consisted of jurors who had no preconceived notions about the case and none of them were challenged for cause. While a large number of jurors knew about the case, that is not the standard for jury service. Even when trying the most severe of charges, the defendant is not entitled to an ignorant jury. *State v. Coe*, 109 Wn.2d 832, 842, 750 P.2d 208 (1988). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* (quoting *Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961)).

We also do not believe that the press coverage of the case was particularly inflammatory. Much of it was not flattering to Mr. Morales, but that largely was the result of his behavior rather than the way the press reported it. Bizarre actions will attract attention, but the fact that the press reports the behavior is not itself a prejudicial fact. The reporting was factual. We have upheld denial of venue change motions in the face of much more inflammatory coverage than that seen here. *See, e.g., State v. Jackson*, 111 Wn. App. 660, 671, 46 P.3d 257 (2002) (holding no abuse of discretion to deny venue change where, during jury selection, a headline in the local paper read, "Would Father Kill Daughter for Love?"), *aff'd*, 150 Wn.2d 251, 76 P.3d 217 (2003).

17

No. 30036-6-III
*State v. Morales*

Given all, the trial court did not abuse its discretion here. The fact that a case is newsworthy is insufficient to support a change of venue. A party must show that the press coverage has had an unfavorable impact on the jurors who served on the case. That did not happen here. The trial court generously granted challenges for cause and the parties freely used their peremptory challenges. None of the jurors who sat on the case were shown to have been impacted by any exposure to the pretrial publicity. In these circumstances, the trial court had very tenable grounds for denying the motion.

The convictions are affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, C.J.

WE CONCUR:

_____
Brown, J.

_____
Kulik, J.

18